**STATE of Tennessee, Appellee,**

**v.**

**Darold David CANNON, a/k/a Darryl Cannon, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

Aug. 18, 1983.

Permission to Appeal Denied by Supreme Court Nov. 28, 1983.

Brett B. Stein, Robert W. Jones, Asst. Public Defender, Memphis, for appellant.

William M. Leech, Jr., Atty. Gen., Gordon W. Smith, Asst. Atty. Gen., Nashville, Henry P. Williams, James C. Beasley, Jr., Asst. Dist. Attys. Gen., Memphis, for appellee.

OPINION

TATUM, Judge.

The defendant, Darold David Cannon, was convicted of two offenses for armed robbery and two offenses for voluntary manslaughter. The victims of the armed robbery offenses were Virgie Lee Brown and Lenord Jones. The victims of the voluntary manslaughter offenses were Eugene Torey, also known as Eugene Mobley, and Joe Winters. Punishment was fixed at 19 years confinement in the State penitentiary for each of the armed robbery offenses and not less than 4 years nor more than 10 years confinement for each of the voluntary manslaughter convictions. The punishment for both manslaughter convictions was enhanced for an additional 5 years confinement for committing the offenses with a firearm. The sentence for one of the manslaughter convictions was ordered to run consecutive to one of the armed robbery convictions. On this appeal, the defendant presents 8 issues for review. After considering the issues and the record, we find that the judgments below must be affirmed.

The robberies and homicides occurred at 1152 West Raines Street in Memphis. The record discloses that at the time of the crimes and for a period prior thereto, people habitually congregated at this address for gambling and drinking purposes. To the west of 1152 West Raines was house number 1166. There is a driveway at 1166 West Raines and east of the driveway, there is a garden. There is a ditch and underbrush in front of 1166 West Raines. To the east of 1152 is 1122 West Raines. There is underbrush between these two residences. On August 8, 1980, Lenord Jones and Joe Winters went to 1152 West Raines where there was a pool table under a tree in the front yard. A dice game was being conducted on the pool table by Junior Holloway. Eugene Torey also came to the address in his automobile. Virgie Lee Brown was also there. Jones, Winters, Torey and Brown were the only black people there except for a black man named "Preacher" who was a "regular" at this address and had told Winters and Jones about the gambling activity there.

Jones, Winters, and Torey got into the dice game with the defendant and several other white men. After about 40 or 50 minutes, the black trio lost all of their money. Winters and Jones walked to Winters' residence where Winters got more money. Winters and Jones returned to the dice game and Winters had a change of luck; he began to win. After winning a substantial amount of money, Winters got out of the game but loaned some money to Jones. Jones, the defendant and two or three other white men began to gamble while Torey, Winters and Brown remained in the vicinity. The defendant went into the house and came back with a .12-gauge shotgun. He shot the gun into the air and ordered the four blacks to put their money on the table. Jones, Winters and Brown complied but Torey had no money. Brown had $40 from his paycheck in his pocket and placed this on the table. After doing so, he raised his hand and asked the defendant if he could have $10 of his money to buy gas. The defendant permitted Brown to retrieve $10. Only the black persons were robbed. Winters protested the taking of his money, saying that he had won fairly, but the defendant ordered Winters and the other victims to leave their money on the table.

After the robbery, Winters and Jones returned to the home of Winters. Jones testi-

fied that as they were leaving, they heard shotgun blasts fired from the direction of the gambling scene. Virgie Lee Brown accompanied Torey to Torey's automobile where Torey got a pistol and walked toward the underbrush east of the gambling premises. Brown left the scene and did not return.

It was established that Torey had a .38 caliber pistol. There was defense proof that Torey shot at the defendant several times from the area east of 1152 Raines. There was substantial evidence that the defendant shot the shotgun, loaded with double aught buckshot at Torey in this direction. After the homicides, one spent cartridge was found in the area east of the gambling premises that had been fired from Torey's .38 caliber revolver. The revolver held 6 bullets in the cylinder. When bullets are ejected from the revolver, all must be ejected simultaneously by a pin in front of the cylinder.

Torey joined Jones and Winters at Winters' house. The trio decided to return to the gambling premises and attempt to enlist the aid of Junior Holloway, the operator of the game, in obtaining the return of their money. As they approached, the defendant stepped from behind a white van parked in the yard near the pool table, and commenced firing the shotgun at them. All three men turned and ran without firing a shot. Jones escaped but Torey and Winters were fatally wounded. Torey's body was found in the underbrush near the northern border of West Raines Street in the yard of 1166 West Raines (the house west of the gambling house). The .38 caliber pistol was lying near his body fully loaded with six live rounds. Winters' body was in the driveway with a sawed-off .22 rifle. It was unloaded and no .22 rifle cartridges were found in the area. Winters' death was caused by a shotgun pellet wound to the head behind the left ear. Torey died from six shotgun pellet wounds in his back. Only 38 cents was found on both bodies. The defendant immediately left and went to Texarkana, Texas.

There was considerable discrepancy in the testimony of defense witnesses. The defendant, testifying in his own behalf, stated that Winters, Torey and Jones asked and received permission to join the dice game. Winters and Torey participated but Jones did not. After the defendant won all of their money, Winters and Jones left and returned with more money. After their return, only Winters participated in the game and he began to win. After suspecting that Winters was using loaded dice, the defendant got out of the game leaving no one but the three black men. They did not shoot dice with each other but attempted to get other people to join the game.

The defendant testified that he repeatedly asked the black men to stop the game. When they did not, he went into the house for his shotgun, came back and fired it into the air and told the three men to leave their money and the dice on the table. Torey was the first to leave and then Brown left. Torey drove 50 yards east of the gambling premises, got out of his car and fired in the defendant's direction. The defendant returned the fire and Torey fired a second time. The defendant then shot two or three times at Torey but wasn't trying to hit him. Torey began running back and forth between the house next door and some brush.

Shortly thereafter, according to the defendant, Virgil Birmingham drove into the yard and defendant related the story to Birmingham. Suddenly Birmingham said, "Watch out, they're coming up behind you." The defendant testified that he turned to the west and saw two men; one of them shot at him. The defendant shot twice in that direction then ran behind the van. The defendant thought that he saw a third man running down the road. There was no more shooting. Virgil Birmingham took the defendant and his two children to the defendant's girlfriend's home and she took them to Texarkana, Texas. Later, he was informed that the police were looking for him and he turned himself in.

The defendant testified that he did not get the money from the pool table. Another defense witness testified that Winters remained at the gambling scene during the first shootout between Torey and the defendant and that Winters took the money from the pool table.

The defendant testified that he had quit gambling when he fired the shotgun into the air and ordered the black men to "leave the money and the dice on the table." He testified that he had not lost money when he stopped gambling, but that he quit as a winner.

We address the issue attacking the sufficiency of the evidence. The defendant's brief does not articulate why he deems that the evidence is insufficient to support the jury's verdicts. The defendant and all other witnesses admitted at trial that the defendant procured a shotgun, fired it into the air, and demanded that Winters, Jones, and Brown put their money on the table. These parties complied with the defendant's demand. According to the State's proof, the defendant had lost his money to Winters "fair and square." According to the defense proof, Jones, Winters and Torey were using loaded dice. There was credible evidence that Jones, Winters, and Torey returned to the gambling premises for the purpose of peaceably recovering their money and that the defendant was waiting for them behind a parked van and fired at them several times with a .12-gauge shotgun loaded with buckshot. There was credible evidence that the defendant was not assaulted when he shot the two victims and that he shot both of them while they were fleeing from him. It is not controverted that both victims were killed with a firearm. There is evidence upon which a rational trier of fact could be convinced beyond a reasonable doubt of the defendant's guilt of all offenses for which he was convicted. We overrule the issue attacking the sufficiency of the evidence. Rule 13(e), T.R.A.P.

The defendant next presents issue that the court erred in allowing the prosecuting attorney to comment during closing argument on the defendant's failure to call his brother and others who were present during the affray. The defendant says that proper predicate for comment on the missing witnesses was not made. In *Delk v. State*, 590 S.W.2d 435 (Tenn.1979), the Supreme Court held that before comment can be properly argued concerning a missing witness, the evidence must show: (1) that the witness had knowledge of material facts; (2) that a relationship exists between the witness and the party that would naturally incline the witness to favor the party; and, (3) that the missing witness was available to the process of the court for the trial.

The defendant asserts that the second requisite was not shown by the evidence. The record reflects that the defendant's brother and a woman named Shirley Mabry both lived in the house with the defendant and that they were present at the scene of the crimes. The other persons who were present regularly visited the house for socializing and drinking. Immediately after the crimes were committed, the police went to the house and arrested all of the persons there as material witnesses. The ten people who were arrested as material witnesses attempted to protect the defendant by not telling the police, when interviewed, that the defendant was even present at the house; his name was not mentioned. It was not until approximately 24 hours later that the police learned of the defendant's presence and implication. We think that these circumstances demonstrated that the witnesses were inclined to favor the defendant.

> In his next issue, the defendant says: "The court erred in not instructing the jury that the law of the right of self-defense includes the duty to retreat since the evidence showed that the defendant was acting in defense of his home."

In support of this contention, the defendant cites *State v. Kennamore*, 604 S.W.2d 856 (Tenn.1980).

The trial judge charged the jury on the "back to the wall" doctrine in the form adopted by the *Kennamore* case:

"The law of excusable homicide requires that the defendant must have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat, if, and, to the extent, that it can be done in safety."

The defendant insists that the "back to the wall" doctrine as above quoted, is not applicable since the defendant was in his front yard when the homicides occurred. In *Morrison v. State,* 212 Tenn. 633, 371 S.W.2d 441 (1963), Tennessee adopted the "castle" doctrine; that is, one assaulted in his own home is under no duty to retreat, but is entitled to stand his ground and repel the force of the attacker with whatever force that is necessary to defend himself. Also see *State v. Kennamore, supra* at 861. These authorities establish that Tennessee has rejected the "no-retreat rule" and the "true man" doctrine, but Tennessee recognizes the "castle" doctrine.

The question with which we are confronted is whether the defendant is entitled to the benefit of the "castle" doctrine even if the jury believed that the victims assaulted him during the second shooting episode. In 40 Am.Jur.2d, *Homicide,* § 167 (1968), it is stated:

"while a person assaulted in his own house is not bound to retreat, his right to invoke this doctrine depends upon his being without fault in bringing on the difficulty."

In *Conley v. State,* 38 Ala.App. 618, 92 So.2d 7, 9 (1956), the court stated:

"The rule that a person need not retreat or seek to escape, even though he can do so without increasing his peril, but may lawfully resist even to the extent of taking life if necessary, where he is assaulted in his own dwelling house or within the curtilage thereof, 'is predicated on the absence of aggression or fault on his part in bringing on the difficulty.' "

In *United States v. Peterson,* 483 F.2d 1222, 1237 (D.C.Cir.1973), the court held that:

"The law is well settled that the 'castle' doctrine can be invoked only by one who is without fault in bringing the conflict on."

All of the proof, including the testimony of the defendant, leaves no doubt that the altercation which resulted in the death of the two victims was brought about by the aggression and fault of the defendant. Under no interpretation of the evidence could it be said that the defendant was blameless in this affair; it was precipitated by his conduct, as above described, in committing the armed robbery and assault with a shotgun. The defendant was not entitled to the benefit of the "castle doctrine" and the trial court properly charged the "back to the wall" rule from the *Kennamore* case.

The defendant's next issue is:

"The verdict on the two counts of robbery with a deadly weapon is a quotient verdict and is invalid in that the jurors were unable to agree on the sentence so they agreed to suggest a sentence and the total would be divided by twelve and the result would be the sentence that they would impose. This procedure was used and the result was a sentence of nineteen years which was set as needed."

The record does not support the facts alleged in this issue. The facts are that after finding the defendant guilty, the jurors could not agree on the sentence to be imposed. At the suggestion of the foreman, an average was taken of the number of years that the jurors thought to be proper punishment. Before the average was taken, there was no agreement by the jurors to be bound by it. After the average of 19 years was computed, the jurors discussed the punishment question for another 30 to 45 minutes and then voted to adopt 19 years as a sentence to be imposed in the armed robbery cases.

A quotient verdict is not lawful in Tennessee. However, in order to vitiate the verdict, there must be an agreement, express or implied, before the calculation is

made that the jurors would be bound by the result. *Thompson v. State,* 197 Tenn. 112, 270 S.W.2d 379, 381 (1954). Since there was no prior agreement, this issue is without merit.

In the next issue, the defendant claims that the trial court erred in refusing to require the State to furnish the defendant a copy of the offense report made by Officer George W. Harris, Jr., for the purpose of cross examining the officer. The defendant demanded the report at the conclusion of Officer Harris's testimony pursuant to the "Tennessee Jencks Act" (Rule 16(a)(1)(E), T.R.Cr.P.).

■ The record reflects that Officer Harris telephoned a report which he said was taped, although he never listened to the tape or saw a transcript of it. The report that the defendant demanded is a computer printout that appears to be a summary of the reports of several different officers, made by an unknown compiler. It bears no one's signature. The report is not a "statement" as defined by Tennessee Rules of Criminal Procedure 16(a)(1)(F), which provides as follows:

> "(F) Definition. The term 'statement' as used in paragraph (E) means:
>
> (i) a written statement made by said witness and signed or otherwise adopted or approved by him; or
>
> (ii) a stenographic, mechanical, electrical, or other recording of a statement, or a transcription or summary thereof, which is an essentially verbatim recital of an oral statement made by said witness."

*State v. Robinson,* 618 S.W.2d 754 (Tenn.Cr.App.1981).

■ However, Officer Harris testified that a report which he telephoned into the police department was taped. This tape or a transcript thereof, should have been furnished to defense counsel pursuant to Rule 16(a)(1)(F), above quoted. The officer having testified that a tape of his report was made and a request having been made pursuant to Rule 16(a)(1)(E) T.R.Cr.P., it was the duty of the State to exercise due diligence in obtaining the tape. *State v. Hicks,* 618 S.W.2d 510 (Tenn.Cr.App.1981).

Although we find that the failure to furnish counsel with the tape was error, we are convinced without doubt that the error was harmless. Officer Harris's testimony was wholly cumulative; he described the crime scene, position of the victims' bodys, and firearms carried by the victims. Other witnesses testified as to the same facts as Officer Harris and there was no dispute or an issue concerning these matters. For these reasons, we hold that the error was harmless by the standard of Rule 36(b), T.R.A.P.

■ In the next issue, the defendant contends that the trial court should have instructed the jury that the crime of robbery could not be committed if the defendant's intent was not to permanently deprive the owner of the owner's property, but was to recover money belonging to the defendant that he lost by gambling. The law is that one may not commit a breach of the peace to recover his own property, but must resort to the process of the law for redress. *Elliott v. State,* 2 Tenn.Cr.App. 418, 454 S.W.2d 187 (1970).

The defendant asks us to reverse the rule in *Elliott v. State,* and other cases. To do so would declare that armed assault is the arbiter of property disputes; that equity is spoken from the mouth of a shotgun. This we decline to do.

Moreover, the defendant testified that he had withdrawn from the dice game before he committed the robbery and that he was a winner when he withdrew. Therefore, under no interpretation could it be said that the defendant committed the robbery to recover money rightfully belonging to him. This issue is without merit.

In the next issue, the defendant contends that the trial court's instruction on flight, constituted an impermissible comment on the evidence and improperly shifted the

burden of proof to the defendant. We disagree.

The trial court's instructions were taken verbatim from Tennessee Pattern Instructions—Criminal 37.16. This instruction does not constitute a comment on the evidence. *Hill v. State,* 3 Tenn.Cr.App. 331, 461 S.W.2d 50, 52 (1970).

Moreover, the instructions did not shift the burden of proof to the defendant. The jury was instructed that the State had the burden of proving all of the elements of the crime beyond a reasonable doubt. The instruction on flight merely informed the jury that flight, along with other facts and circumstances, permitted, but did not require, an inference of guilt. The jury was instructed that the fact of flight alone would not allow a guilty verdict and that innocent persons might take flight. The jury was fully and meticulously instructed that the burden of proof never shifted to the defendant and that the presumption of innocence remained with the defendant throughout every stage of the trial. It was clearly stated that to overcome the presumption of innocence, the State must prove the defendant's guilt beyond a reasonable doubt. We find nothing in the instructions that could be understood by the jury to shift the burden of proof to the defendant. There is no merit in this issue. *See Armes v. State,* 540 S.W.2d 279 (Tenn.Cr.App.1976).

Finally, the defendant contends that the trial court erred in ordering one manslaughter sentence to be served consecutively to a robbery sentence. We agree with the trial judge that the defendant was a "dangerous offender" so as to authorize consecutive sentencing under *Gray v. State,* 538 S.W.2d 391 (Tenn.1976), in which the Supreme Court held that the commission of multiple inherently dangerous crimes will not authorize consecutive sentences unless they are accompanied by aggravating circumstances. All of the crimes for which the defendant was convicted are inherently dangerous and were accompanied by aggravating circumstances. The aggravations are that in committing the robberies, the defendant discharged the shotgun loaded with deadly buckshot in the vicinity of several people. He shot and killed the two manslaughter victims while they were running away from him.

Whether sentences should be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court. *Williams v. State,* 520 S.W.2d 371 (Tenn.Cr.App.1974); T.C.A. § 40-20-111, formerly § 40-2711. We find that the trial court acted within its discretion in ordering consecutive sentences in this case.

It results that the judgment below is affirmed.

WALKER, P.J., and SCOTT, J., concur.