IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 12, 2002

## STATE OF TENNESSEE v. ANTHONY MURFF, aka ANTHONY MUFF

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 7022     Joseph H. Walker, III, Judge**

---

**No. W2001-01459-CCA-R3-CD  - Filed June 11, 2002**

---

The defendant was convicted by a Lauderdale County Circuit Court jury of especially aggravated robbery, a Class A felony, and sentenced by the trial court as a Range III, persistent offender to sixty years, to be served at 100%, in the Tennessee Department of Correction.  He raises three issues on appeal: (1) whether the evidence was sufficient to support his conviction; (2) whether the trial court erred in using his prior Illinois convictions to classify him as a persistent offender; and (3) whether the trial court erred in its application of enhancement factors.  We conclude that the evidence was more than sufficient to support the defendant's conviction, and that his prior convictions in Illinois qualified him as a persistent offender.  We further conclude that, although the trial court erred in applying three enhancement factors, the remaining enhancement factors justify the sixty-year sentence imposed in this case.  Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Gary F. Antrican, District Public Defender, and Julie K. Pillow, Assistant Public Defender, for the appellant, Anthony Murff.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; Elizabeth T. Rice, District Attorney General; Tracey Anne Brewer, Assistant District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## <u>FACTS</u>

On May 27, 2000, the seventy-seven-year-old victim, Robert Milton Woodard, Sr., who was partially paralyzed from a stroke, was alone in his apartment in Ripley when the forty-one-year-old

defendant, Anthony Murff, came to his door, ostensibly seeking payment for having mowed the victim's lawn. When the victim admitted the defendant into his home, the defendant struck him multiple times in the head with a hammer, bound his arms behind his back with an electrical cord, and took cash from his wallet. The defendant was subsequently indicted on one count of especially aggravated robbery and one count of aggravated assault.

The defendant's trial was held February 22-23, 2001. The State's first witness was the elderly victim, who described having been attacked and robbed by the hammer-wielding defendant on the evening of May 27, 2000. The victim testified that he heard a knock at his front door at about 8:00 or 8:30 p.m, looked out his peephole, and recognized the man who had mowed his yard and whose mother lived in the next-door apartment. Opening his door, he said to the defendant, "I guess you're here after your money," and the defendant replied, "Yes." The victim testified that he thought he owed the defendant $5, and told him he would have to write a check because he did not have the exact change. When he turned around to get his checkbook, the defendant started hitting him in the back of the head with a hammer, demanding, "Where's your money and guns?" The victim said he told the defendant that thieves had taken his guns, and that he did not have any money on him, except for a $10 bill in his wallet in his hip pocket. He said he told the defendant, "Just go ahead and take that," and he thought the defendant had done so.

The victim estimated that the defendant hit him twenty-five to thirty times with the hammer before shoving him onto the living room couch and tying his hands behind his back with an electrical cord he cut from a floor lamp. He said the defendant went to the back of the apartment, out of his line of vision, during part of the time that he was there. When he could no longer hear the defendant, the victim went to his bedroom and telephoned 911, having apparently somehow managed to free one arm. The police kicked his door open when they arrived, and he reacted by shooting a gun that he had hidden in his bedroom. The victim explained that it was dark, and he had mistaken the policeman who first entered his home for the defendant, "coming back" to "finish [him] off." He testified that he was taken first to the emergency room of the local hospital and then to the Regional Medical Center in Memphis ("The Med"), where surgeons implanted a steel plate in the top of his head.

The victim acknowledged on cross-examination that he had probably owed the defendant money for cutting his grass. However, he could not remember the defendant having told him he owed $10, and denied that there had been any dispute over how many times the defendant had cut the grass, or the amount he owed. He also denied that he had cursed or hit the defendant, or threatened to shoot or kill the defendant or his mother. The victim testified that all the drawers in his bedroom dresser were open, but as far as he could determine, the only thing taken from his apartment was the cash from his wallet. He said that he kept his loaded gun in his sock drawer, and his sock drawer was the only drawer he had opened. Although he acknowledged it was "possible" that the defendant had brought him a towel for his head wound, he had no memory of his having done so. He said that the defendant had not offered to call for help and had shoved, rather than assisted, him onto the couch. The victim denied that he had a problem with alcohol, or that he had been drinking on the day he was attacked.

On redirect, the victim testified that the defendant kept saying "over and over" during the attack that someone had told him that the victim had $15,000 in his apartment. The victim testified, however, that the only money he had was $10 or $12 in his wallet, and that the defendant took the money only after "about beat[ing] [his] head in" with the hammer.

Sergeant Charles L. "Buddy" Smith of the Ripley Police Department, who had known the victim for forty years, testified that he and fellow officers arrived at the victim's apartment at about 9:17 p.m. Unable to get a response at either the front or the rear door, he stood on tiptoes, shining his flashlight into the apartment through a small window at the top of the front door. When he saw dentures lying in a pool of what appeared to be blood near the front door, they kicked the front door open to gain forcible entry into the apartment. Smith testified that Officer Jamie Jarrett was the first to enter the apartment, and that he slipped in a pool of blood as he went through the door. At about the same time, two shots rang out, and Smith, who entered the apartment immediately behind Jarrett, saw the victim, dressed in a T-shirt and white boxer shorts, "slouching along"[1] the hallway from the back bedroom. Smith testified that he ducked behind the door and called the victim by name, telling him that it was the police, that it was "Buddy," and to put his gun down. The victim complied, stumbling forward into Smith's arms and allowing Smith to take his gun and place it on a living room chair out of his reach.

Smith testified that blood was "profusely coming" from the victim's head and face. One of his hands was free; the other was tied so tightly with an electrical cord that it was turning "purplishy-red." When he asked the victim who had attacked him, the victim told him, "My yard man did it." Smith identified a number of photographs of the crime scene, including ones that showed the victim's dentures lying in a pool of blood, blood-soaked cushions on the couch, the victim's wallet and keys lying on a televison tray in the living room, the electrical cord used to tie the victim's hands, the floor lamp from which the cord was cut, and the general disarray in the victim's bedroom. He testified that the dresser drawers in the victim's bedroom were pulled out, the closet door was open, the mattress was pushed off-center on the bed, and an open jewelry box was on the edge of the bed. According to Smith, the dresser drawers and the jewelry box had been "gone through." On cross-examination, he acknowledged that the clothes in the victim's dresser drawers appeared to be neatly folded and lying flat, and testified that he had not smelled any alcohol on the victim's breath.

Off-duty Ripley Police Officer Rich Mawyer, who was also a paramedic, heard the radioed calls for assistance and went to the victim's apartment to aid the emergency medical technicians who were assisting the victim. Mawyer testified that the victim had a serious head injury and had lost a "considerable amount of blood." Around the victim's right wrist, he found a lamp cord tied so tightly that the distal portions of the victim's arm had become badly swollen and discolored. Mawyer said that the victim was in severe pain and extremely upset. He testified that the victim told him that the man who cut his grass had knocked on his door, pushed his way into his apartment, and

---

[1] Sergeant Smith indicated that the victim's slouching gait was the result of his earlier stroke.

immediately started hitting him in the head with a hammer, which the victim assumed he had brought with him.

The defendant's mother, June Brewer, who lived next door to the victim, testified that the defendant came to her apartment at about 1:30 p.m. on May 27, 2000, bringing with him a bag of clothes because he planned to spend the night. She said that he left her apartment at about 5:30 or 6:00 p.m., dressed in white jogging pants and a white shirt with stripes, and that she did not see him again that day. On cross-examination, Ms. Brewer testified that the defendant had mowed the victim's yard twice, but the victim had not been home on several occasions when the defendant had attempted to collect payment. She testified on redirect that the defendant did not have any injury to his face when she saw him on May 27, 2000.

Steve Sanders, a criminal investigator with the Ripley Police Department, arrived at the victim's apartment at approximately 10:05 p.m. on May 27, 2000, after the arrival of Criminal Investigator Jeff Fayne and the securing of the crime scene. Sanders described the bloody condition of the victim's living room, and testified that the disarray in the victim's bedroom included a knocked-over lamp, a telephone on the floor, open dresser drawers in which the clothes appeared to have been moved around, the mattress at an angle on the bed with the victim's watch lying on the exposed box springs, and an open jewelry box on the bed, in which the contents appeared to have been rearranged. He said that during their search of the surrounding area, Fayne discovered some clothing and a wooden-handled hammer in a plastic grocery bag inside a city garbage cart about 100 yards from the victim's apartment. Sanders identified a photograph of the grocery bag and its contents, testifying that the bag contained a pair of white jogging pants, a pair of white tennis shoes, a black sock, a white glove, and a wooden-handled hammer with a hole drilled in the handle. He said that there appeared to be blood on the shoes, on the pants, and on both the claw and head areas of the hammer.

Sanders and Fayne later questioned the defendant at city hall. After he had been advised of his Miranda rights and had signed a waiver of rights form, the defendant made a statement in which he admitted that he had hit the victim in the head with the hammer, tied him up with the electrical cord, and taken $10 from his wallet. However, as the following portion of the statement reveals, the defendant attempted to portray the victim as the aggressor in the encounter:

> I Anthony Murff went to [the victim's] door and knocked and ask [sic] him could he pay me for cutting his yard. He said how much do I owe you? I told him that he owed me $10.00. He said how in hell do I owe you $10.00 and I said I cut your yard week before last and last week. He said your [sic] a lying mother fucker and slapped me. After he slapped me he started to turn around and said let me get my gun I'm going to kill your black ass. At that point I hit him in the head with the hammer. After I hit him we got into a wrestling match where he continued to tell me that he was going to kill [me]. [The victim] then fell into the floor and continued to say I'm going to kill

-4-

you and your mother. I then told [the victim] that all I came over here for was the money that you owe me. I then helped [the victim] up off the floor and set [sic] him on the couch and told him that I was sorry. [The victim] said It don't [sic] matter I [sic] still going to kill your black ass. [The victim] kept trying to get up off the couch saying let me get my gun, thats [sic] when I tied him up with the cord that I cut off of a lamp to keep him from getting the gun and killing me or my mother. Just before I tied him up I got $10.00 out of his wallet after he threw it at me.

The defendant also told the investigators that he had changed his clothes at his mother's apartment and placed a grocery bag, containing the hammer and the clothes he had worn during the attack, in a garbage can down the street from his mother's home.

Sanders testified that he had examined and copied the victim's medical records from Baptist Memorial Hospital-Lauderdale and The Med. These medical records were admitted into evidence by stipulation of the parties. Sanders testified that the victim's medical records revealed that he suffered multiple lacerations and injuries to his head, neck, and jaw during the attack, including "multiple complex lacerations observed to the head after it was shaved, depressed skull fracture which required that . . . a skull fracture plate be inserted in [the victim's] head, and . . . two other complex scalp lacerations on the right side of his head that had to be stapled together."

Sanders acknowledged on cross-examination that it was within "the realm of possibility" that the disarray he had observed in the victim's bedroom was caused by the victim, and that neither the victim nor his family had ever reported anything missing other than the cash taken from the victim's wallet. He said that Fayne had attempted to lift fingerprints from the victim's bedroom but had been unsuccessful. On redirect, he testified that he had not seen any sign of injury to the defendant when he interviewed him after the incident. [2]

Patrolman Kelly Schroburger of the Ripley Police Department testified that he located the defendant approximately four-tenths of a mile from the victim's apartment, between 10:00 and 11:00 p.m. on May 27, 2000, and took him to the police department. He said that the defendant was dressed in clean, neatly pressed dress pants, dress shirt, and clean dress shoes, and the defendant told him he had been at his mother's house.

Tennessee Highway Patrol Officer Jamie Jarrett, who had been an officer with the Ripley Police Department on May 27, 2000, testified that he was the first officer to enter the victim's residence in response to his 911 call. As he entered the dark apartment, yelling "Police, police," he

---

[2] Sanders also testified that the victim picked the wrong photograph out of a photographic lineup he was shown during his stay in the geriatric wing of the Baptist Memorial Hospital-Lauderdale, after he had been released from The Med. Sanders testified, however, that the victim did not have his eyeglasses at the time he viewed the lineup. The defendant's identity as the perpetrator was apparently never in question, and he does not raise it as an issue on appeal.

saw the victim standing in the hallway dressed in a "very bloody" white T-shirt and white underpants, and bleeding "real bad" from his head and face. He next saw the victim reach toward his bed, saw a flash, heard a "bang," and realized that the victim was shooting at him. Jarrett testified that he was not hurt and had no hard feelings against the victim for shooting at him. He knew the victim had been very frightened and understood the victim's reaction.

Lauderdale County Jail Administrator Timothy A. Bratton testified that the defendant's inmate medical history reflected that he did not exhibit any visible signs of illness or trauma, and he answered "[n]o" to whether he had suffered any recent head injury, when he was booked into the jail at 4:36 a.m. on May 28, 2000. Richard Rhodes, the officer who took the medical history, testified that he did not see any signs of injury to the defendant, and he remembered the defendant telling him that he did not have any head injury or illness to report.

Ripley Police Department Criminal Investigator Jeff Fayne described his investigation of the incident, and identified the items he found in the garbage cart. He testified that there were drops of blood on the hammer and "quite a bit of blood down around the legs" of the defendant's white jogging pants, as well as "some up around the mid-thigh area." He also found a drop of blood beside the door mat outside Ms. Brewer's door, as well as on the door itself. During his interview with Ms. Brewer, she "stated that her son had a hammer that had been at her apartment that had a hole drilled in the handle of it." The defendant, when questioned, told him that he had been driving a nail into his mother's wall in order to fix a place to tie his dog. However, Fayne saw no signs of any dog at or around Ms. Brewer's apartment, and found no evidence of where one could have been tied. He saw no evidence of any injury to the defendant when he took his statement.

Fayne testified that he took the victim's statement at the Intensive Care Unit of The Med on May 31, 2000. He identified photographs, which were subsequently admitted into evidence, showing the extent of the victim's injuries at that time. Fayne testified that most of the victim's injuries occurred to the right side of the back of his head and his right shoulder. However, in addition to these "severe, severe injuries," the victim also had an injury to his left jaw, a cut on his left leg above his knee, and various bruising and cuts on his right forearm and hand, which Fayne characterized as defensive wounds.

The only witness to testify on the defendant's behalf was the custodian of the medical records at the Baptist Memorial Hospital-Lauderdale. Through her testimony, the defendant's medical records were introduced into evidence. These records indicate that the defendant was admitted to the hospital on April 29, 2000, approximately one month before the instant offense, complaining of asthma, and was discharged on May 1, 2000, with a "discharge diagnosis" that included "status post contusion of left eye with possible mass or hematoma of left maxillary sinus." The records further reflect that a CT scan of the head was ordered during the defendant's hospital stay "due to the recent history of trauma and to the possible fracture of the inferior orbit," and that the defendant underwent a surgical biopsy of the mass on August 30, 2000.

The jury found the defendant guilty of especially aggravated robbery, a Class A felony, and set a fine of $10,000. Based on his prior felony convictions in Illinois, the trial court classified the defendant as a Range III, persistent offender. Finding six enhancement factors applicable, and no factors in mitigation, the court imposed a sentence of sixty years, the maximum allowed for a Range III offender convicted of a Class A felony. Thereafter, the defendant filed a timely notice of appeal to this court, challenging his conviction and sentence.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his conviction. When the sufficiency of the evidence is raised as an issue on appeal, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved not by this court, but by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). When a defendant is convicted by a jury, his presumption of innocence is replaced with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient to support his conviction. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A conviction for especially aggravated robbery requires that the State prove (1) an intentional or knowing theft of property from the person of another by violence or putting the person in fear; (2) accomplished with a deadly weapon; and (3) where the victim suffers serious bodily injury. See Tenn. Code Ann. §§ 39-13-401(a), -403(a) (1997). Theft of property occurs when a person, acting with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. See Tenn. Code Ann. § 39-14-103 (1997).

The defendant apparently concedes that he used a deadly weapon, that the victim sustained serious bodily injury in the attack, and that he took $10 from the victim's wallet. Nonetheless, he contends that the evidence was insufficient to support his conviction for especially aggravated robbery because the State failed to show that he took anything from the victim other than the "ten dollars that both parties agreed was owed for lawn mowing services." Although the defendant's argument on this issue is not entirely clear, we surmise that he is relying on the "owner of property"

language in the definition of theft of property to assert that he cannot be convicted of robbery for taking his own property from the victim, *i.e.*, the $10 he claims he was owed.

The defendant is mistaken. As an initial matter, we note that the record contradicts his assertion that "both parties agreed" that the lawn mowing debt was $10. The victim testified he thought the defendant was there to collect $5, the usual amount the victim paid the defendant for cutting his grass. However, the amount of money the victim may have owed the defendant has no bearing on the defendant's conviction for especially aggravated robbery. The manner in which property is taken, rather than to whom it lawfully belongs, is the issue in robbery offenses. See State v. Cannon, 661 S.W.2d 893, 899 (Tenn. Crim. App. 1983); Elliott v. State, 454 S.W.2d 187, 188 (Tenn. Crim. App. 1970). "'The gist of the offense of robbery is the felonious and forcible taking from the person of another goods of value by putting him in fear.'" State v. Claybrooks, 910 S.W.2d 868, 871 (Tenn. Crim. App. 1994) (quoting Elliott, 454 S.W.2d at 188). Although our current definition of robbery is slightly different, see Tenn. Code Ann. § 39-13-401(a) (1997), the principle remains the same, see State v. Darrell Wentzel, No. 01C01-9705-CC-00193, 1998 Tenn. Crim. App. LEXIS 1263, at *19 n.4 (Tenn. Crim. App. Dec. 7, 1998) ("[N]othing in the aggravated robbery statutes requires proof of ownership."), perm. to appeal denied (Tenn. May 10, 1999); State v. Paul Dwight Finchum, No. 02C01-9105-CR-00087, 1991 Tenn. Crim. App. LEXIS 845, at *4 (Tenn. Crim. App. Oct. 16, 1991) ("[A] person who commits the acts necessary to constitute the offense of armed robbery is nonetheless guilty of that offense even though the property taken in the robbery is the property of the robber."); State v. Steven E. Moore, No. 88-240-III, 1989 Tenn. Crim. App. LEXIS 242, at *3 (Tenn. Crim. App. Mar. 28, 1989) ("The defendant is guilty of armed robbery even if he could show he only took his own money from the victim."). Thus, evidence that the defendant took *any* amount of cash or property during his violent hammer-wielding attack on the victim would be sufficient to support his conviction for especially aggravated robbery, regardless of how much the victim owed or whether he refused to pay the debt.

Viewed in the light most favorable to the State, the evidence establishes that the defendant struck the victim repeatedly with a hammer, took at least $10 in cash from his wallet, shoved him onto the couch, tied his hands behind his back with an electrical cord, and ransacked his bedroom, presumably in search for more cash, guns, or other valuables. The evidence further establishes that the victim suffered serious, life-threatening injuries as a result of the attack, losing substantial amounts of blood and sustaining a depressed skull fracture that required the surgical insertion of a metal plate into his skull. We, therefore, conclude that the evidence was more than sufficient to support the defendant's conviction for especially aggravated robbery.

## II. Sentencing

The defendant's second and third issues involve challenges to the trial court's sentencing determinations. When an accused raises challenges to the sentencing determinations in his case, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the

trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103 and -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987). The defendant, as the party challenging the sentence imposed by the trial court, has the burden of establishing that his sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

### A. Classification as Persistent Offender

The defendant first contends that the trial court erred in relying on his prior Illinois convictions to classify him as a Range III, persistent offender. The trial court may sentence a defendant as a Range III offender when it finds beyond a reasonable doubt that the defendant is a persistent offender. Tenn. Code Ann. § 40-35-107(c) (1997). A persistent offender is defined, *inter alia*, as a defendant who has been convicted of "[a]t least two (2) Class A or any combination of three (3) Class A or Class B [felonies] if the defendant's conviction offense is a Class A or B felony." Id. § 40-35-107(a)(2) (1997). Prior convictions for the purposes of sentencing include convictions under the laws of any other state which, if committed in Tennessee, would have constituted offenses cognizable by the laws of this state. Id. § 40-35-107(b)(5) (1997). In the event that an out-of-state conviction is not a named felony in Tennessee, "the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given." Id. For range enhancement purposes, a "certified copy of the court record of any prior felony conviction, bearing the same name as that by which the defendant is charged in the primary offense, is prima facie evidence that the defendant named therein is the same as the defendant before the court, and is prima facie evidence of the facts set out therein." Id. § 40-35-202(a) (1997).

The State introduced certified records from the Illinois Department of Corrections to show that the defendant had several prior convictions in Cook County, Illinois, including a March 27, 1978, conviction for an armed robbery, committed on July 29, 1977; two March 28, 1978, convictions for armed robberies, involving two victims, committed on October 24, 1977; and two 1988 convictions for aggravated criminal sexual assault. Without undertaking an analysis of the elements of the Illinois crimes, the trial court found that armed robbery and aggravated criminal sexual assault would be B felonies in Tennessee, and that the defendant therefore had the requisite three prior B felony convictions to meet the statutory definition of a Range III, persistent offender. In so finding, the trial court apparently counted the defendant's two March 28, 1978, convictions for armed robbery, as well as his two 1988 convictions for aggravated criminal sexual assault, as single convictions for range enhancement purposes.

The defendant asserts that neither armed robbery nor aggravated criminal sexual assault is a named offense in this state, and contends that the trial court therefore erred by failing to analyze

the elements of the Illinois convictions to determine if they would constitute B felonies in Tennessee. He further argues that the lengths of the sentences he received for the armed robbery convictions suggests that these convictions would be C, rather than B, felonies in Tennessee, and there is insufficient evidence in the record to determine whether his conviction for aggravated criminal sexual assault would be the equivalent of a Class B felony in this state. The State argues that an examination of the elements of the Illinois offenses reveals that they are the equivalent of Class B felonies in Tennessee.

The certified records of the defendant's Illinois convictions reveal that he entered a plea of guilty on March 27, 1978, to one count of armed robbery under indictment number 77-4877, and received a sentence of six years in the Illinois Department of Corrections. The "Official Statement of Facts" provides the details of this offense:

> On July 29, 1977 at 1:00 a.m. the victim Steve Egert and Michael Walker drove with two other subjects to a parking lot located at 3537 South Wabash, Chicago, Illinois. While in the parking lot the defendant, and another offender both armed with baseball bats approached the car. The other offender pulled Michael Walker out of the car, and beat him several times over the head with the baseball bat causing his death. Steve Egert was knocked to the ground. The defendant then proceeded to rob both Egert and Walker of an undetermined amount of money, and a radio which was taken from the victim's car.

The certified records further reveal that the defendant entered pleas of guilty on March 28, 1978, to two additional counts of armed robbery under a separate indictment, "Information No. 77-I-6015," for which he apparently received two concurrent six-year sentences, with "both counts to run concurrent with" his six-year sentence under indictment number 77-4877. According to the pertinent portion of the Official Statement of Facts:

> On October 24, 1977 at 9:45 p.m., at 3542 South State, the defendant and three (3) co-offenders approached the two (2) victims. Two (2) of the offenders produced guns and the other two (2) offenders removed an AM/FM radio and tape player from victim number one, and $1.50 United States Currency from victim number two.

Finally, the Illinois Department of Corrections records also include a one-page "Order of Sentence and Commitment to Illinois Department of Corrections" which reflects that the defendant was convicted by a jury in 1988 of two counts of aggravated criminal sexual assault, in violation of chapter 38, section 12-14, paragraph A(2) of the Illinois Revised Statutes, and that he was sentenced on August 11, 1988, to fifteen years on each count, to be served concurrently. There is no "Official Statement of Facts" included within the record on appeal regarding these latter two convictions.

The defendant asserts that, because neither armed robbery nor aggravated criminal sexual assault are named felonies in this state, the trial court was required to make an analysis on the record of the elements of his Illinois convictions to determine if they would constitute B felonies in Tennessee. The defendant is correct that neither of these offenses is a named offense under current Tennessee law. However, the proper analysis of an out-of-state conviction is under the law of this state as it existed at the time of the out-of-state conviction. State v. Brooks, 968 S.W.2d 312, 313-14 (Tenn. Crim. App. 1997), perm. to appeal denied (Tenn. 1998). At the time of the defendant's Illinois convictions for armed robbery, Tennessee case law routinely recognized "armed robbery," defined as "the felonious and forcible taking from the person of another, goods or money of any value, by violence or putting the person in fear . . . accomplished by the use of a deadly weapon . . . .," Tenn. Code Ann. § 39-3901, as an offense in Tennessee. See, e.g., Adams v. State, 547 S.W.2d 553, 554 (Tenn. 1977). The Illinois statute in effect at the time was virtually identical, defining "armed robbery" as "when a person takes property from a person by the use of force or by threatening the imminent use of force while armed with a dangerous weapon." People v. Crespo, 455 N.E.2d 854, 860 (Ill. App. Ct. 1983) (citing Ill. Rev. Stat. 1977, ch. 38, pars. 18-1, 18-2) (current version at 720 Ill. Comp. Stat. 5/18-1, 5/18-2). Thus, there is no doubt that the defendant's armed robbery convictions in Illinois would have constituted felonies under the law of this state.

The defendant argues that the six-year sentences he received for his armed robbery convictions in Illinois suggest that these crimes would be Class C, rather than Class B, felonies in Tennessee. However, the length of a defendant's sentence for an out-of-state conviction does not determine the classification the offense would carry in this state. See generally Brooks, 968 S.W.2d at 313-14; State v. Jerry W. Rodgers, No. W1999-01443-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 788, at **9-15 (Tenn. Crim. App. Oct. 11, 2000). Although the defendant's Illinois convictions predated our current classification system, and fall outside the conversion chart for the classification of prior felony offenses, see Tenn. Code Ann. § 40-35-117(c) (1997), we conclude that they may be counted as Class B felonies for range enhancement purposes. In the year following the defendant's armed robbery convictions in Illinois, the Tennessee Legislature enacted the Class X Felonies Act of 1979, Tenn. Code Ann. §§ 39-5401–39-5404, which made armed robbery one of eleven offenses considered "particularly heinous and dangerous to human life," for which, *inter alia*, full service of the sentence was required. State v. Taylor, 628 S.W.2d 42, 46-47 (Tenn. Crim. App. 1981).[3] Moreover, under the robbery statutes currently in effect in this state, the defendant's armed robbery convictions in Illinois would constitute the offense of aggravated robbery, which is designated as a Class B felony. See Tenn. Code Ann. §§ 39-13-401, -402 (1997).

The trial court apparently counted the defendant's two March 28, 1978, convictions for armed robbery as a single conviction for range enhancement purposes. It need not have done so.

_____

[3] In fact, armed robbery was apparently considered so heinous at one time that it carried a potential punishment of death by electrocution. See Moorman v. State, 577 S.W.2d 473, 475 (Tenn. Crim. App. 1978) ("'provided, that if the robbery be accomplished by the use of a deadly weapon the punishment shall be death by electrocution, or the jury may commute the punishment to imprisonment for life or for any period of time not less than ten (10) years'") (quoting Tenn. Code Ann. § 39-3901).

Although the Code provides that "[c]onvictions for multiple felonies committed as part of a single course of conduct within twenty-four (24) hours constitute one (1) conviction for the purpose of determining prior convictions," Tenn. Code Ann. § 40-35-107(b)(4) (1997), it also provides, "in accord with the policy of giving greater 'weight' to crimes of violence," id. § 40-35-106, Sentencing Commission Cmts., that "acts resulting in bodily injury or threatened bodily injury to the victim or victims shall not be construed to be a single course of conduct[.]" Id. § 40-35-107(b)(4). Because the defendant's March 28, 1978, convictions involved the use of a gun and the robbery of separate victims, they may properly be counted as separate convictions for range classification purposes. See id. § 40-35-106, Sentencing Commission Cmts. ("[I]f the defendant was convicted of robbing several people in the same store, such would constitute separate convictions for enhancement purposes for a new violation of the law.").

The defendant also contends that the record contains insufficient detail to determine whether his convictions for aggravated criminal sexual assault would constitute B felonies in this state. We disagree. The record specifies that the defendant was convicted of a violation of chapter 38, section 12-14, paragraph A(2) of the Illinois Revised Statutes, which provided that a defendant committed aggravated criminal sexual assault if he committed an act of sexual penetration by the use of force or the threat of the use of force, and caused bodily harm to his victim. People v. Fryer, 618 N.E.2d 377, 382 (Ill. App. Ct. 1993) (quoting Ill. Rev. Stat. 1987, ch. 38, pars. 12-13(a)(1), 12-14(a)(2)) (current version at 720 Ill. Comp. Stat. 5/12-13, 5/12-14). However, since the defendant's three prior armed robbery convictions are sufficient to qualify him as a Range III, persistent offender, we need not undertake any analysis of his 1988 convictions to determine if they would have equated to B felonies in this state at the time the offenses occurred.

In sum, we find that each of the defendant's three prior armed robbery convictions in Illinois counts as a prior Class B felony for sentencing purposes. Accordingly, we conclude that the trial court did not err in classifying the defendant as a Range III, persistent offender.

## B. Application of Enhancement Factors

The defendant next contends that the trial court erroneously applied several enhancement factors to increase his sentence from the presumptive midpoint to the maximum sentence in his range. As a Range III offender convicted of a Class A felony, the defendant was subject to a sentence ranging from a minimum of forty to a maximum of sixty years. See Tenn. Code Ann. § 40-35-112(c)(1) (1997). When there are no enhancement factors present, the presumptive sentence for an offender convicted of a Class A felony is the midpoint in the range. Id. § 40-35-210(c). Procedurally, the trial court is to increase the sentence from the midpoint based on the application of any enhancement factors, and then reduce the sentence as appropriate based on the existence of any applicable factors in mitigation. Id. § 40-35-210(e).

The trial court found no mitigating factors applicable, and increased the defendant's sentence to the maximum in the range based on its finding that the following six enhancement factors were applicable to his case: (4) the victim was particularly vulnerable due to his physical disability; (5)

-12-

the defendant treated the victim with exceptional cruelty during the commission of the offense; (6) the personal injuries inflicted on the victim were particularly great; (8) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community; (10) the defendant had no hesitation about committing a crime when the risk to human life was high; and (16) the crime was committed under circumstances under which the potential for bodily injury to a victim was great. See Tenn. Code Ann. § 40-35-114(4), (5), (6), (8), (10), (16) (1997 & Supp. 2001). The defendant argues that enhancement factors (5), (6), (10), and (16) were inherent in his offense, and that the evidence does not support the trial court's finding that enhancement factor (4) was applicable to this case. The State concedes that factors (6), (10), and (16) were inappropriately applied, but contends that factors (4), (5), and (8) were proper for the offense and justify the sixty-year sentence imposed by the trial court.

The determination of whether an enhancement factor is applicable must be made on a case-by-case basis. State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000). Enhancement factors may appropriately be applied "only when the factors are 'appropriate for the offense' and 'not themselves essential elements of the offense.'" State v. Lewis, 44 S.W.3d 501, 504 (Tenn. 2001) (quoting State v. Poole, 945 S.W.2d 93, 95 (Tenn. 1997)). If the same facts that establish an element of the offense are used to establish an enhancement factor, then the enhancement factor may not be used to increase punishment. State v. Lavender, 967 S.W.2d 803, 807 (Tenn. 1998) (citing State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)).

We agree that enhancement factors (6), the victim's personal injuries were particularly great, (10), the risk to human life was high, and (16), the potential for bodily injury was great, were essential elements of the defendant's offense. A conviction for especially aggravated robbery requires that the State prove that the defendant committed a robbery with a deadly weapon and caused serious bodily injury to the victim. Because "'proof of serious bodily injury will always constitute proof of particularly great injury,'" and "there is necessarily a high risk to human life and the great potential for bodily injury whenever a deadly weapon is used," factors (6), (10), and (16) were all inherent in the defendant's offense. State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995) (quoting State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994)). Therefore, these three enhancement factors should not have been applied.

The trial court based its application of enhancement factor (4), the victim was particularly vulnerable because of age or physical or mental disability, on the victim's partial paralysis as a result of a stroke. The defendant contends that this factor was erroneously applied because there was no proof that the victim's disability prevented him from summoning help, or played any role in the commission of the offense. In support of his contention that the victim's partial paralysis was not a factor in the commission of the offense, the defendant cites State v. Poole, 945 S.W.2d 93 (Tenn. 1997), to argue that no one, regardless of physical condition, could have resisted the offense in the manner in which it was committed, *i.e.*, with the victim struck in the back of the head with a hammer while his back was turned to the defendant.

-13-

Poole stands for the proposition that enhancement factor (4) is inapplicable when a victim's vulnerability, whether by virtue of extreme youth, old age, or physical or mental disability, is found irrelevant to the commission of the offense. Id. at 97. As our supreme court recently explained, "[a] victim's age or physical condition might make the victim 'vulnerable' in a general sense. That particular vulnerability, however, may play no part in the crime. A vulnerability that is wholly irrelevant to the crime is not 'appropriate for the offense' as required by Tenn. Code Ann. § 40-35-114." State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001). To illustrate this point, the Lewis court cited State v. Butler, 900 S.W.2d 305, 313 (Tenn. Crim. App. 1994), "holding advanced age of victim irrelevant when 'weight lifter, football player, or any other person, male or female, who possessed adequate strength to resist a crime against the person' would have been killed by the defendant's reflex gunshot from a distance," and State v. Seals, 735 S.W.2d 849, 853-54 (Tenn. Crim. App. 1987), "holding advanced age of victims irrelevant when crime was theft from victim's [sic] mailboxes, and criminals had no contact with victims themselves[.]" Lewis, 44 S.W.3d at 505.

The instant case, however, differs both from Seals, in which the crime involved no contact with the victim, and from Butler, in which the victim's injury was caused by a distant gunshot wound that made the victim's physical strength, or lack thereof, irrelevant. Here, the victim was struck repeatedly with a hammer during an encounter that took place at close quarters. The first blows to the back of the victim's head did not render him unconscious or incapable of attempting to shield himself from further blows, as evidenced by the defensive wounds found on his right hand and arm. There can be little doubt, however, that a young and able-bodied man would have been much better able to defend himself from the defendant's attack than the partially paralyzed, seventy-seven-year-old victim in this case. We conclude, therefore, that the trial court did not err in applying enhancement factor (4) to increase the defendant's punishment.

The defendant contends that the trial court erred in applying enhancement factor (5), the defendant treated the victim with exceptional cruelty during the commission of the offense, because it relied on the same facts to establish this factor as those used by the State to establish the serious bodily injury element of his offense. Before enhancement factor (5) may be applied, the facts in the case must "support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the crime. Poole, 945 S.W.2d at 98 (citing Jones, 883 S.W.2d at 603). In finding this factor applicable, the trial court noted, in addition to the severe injuries the victim had suffered, the cruel and violent manner in which the injuries were inflicted:

> The Court finds that enhancing factor number 5 should be applied, the defendant treated the victim with exceptional cruelty during the commission of the offense, striking him in the head with a steel hammer, or metal object, sufficiently enough where his skull was crushed. He had to have a metal plate inserted in his head. He has permanent damages, seizures, hallucinations, flashbacks, panic attacks, he has become incontinent, he was hospitalized for a long period of time, he was treated in Baptist Lauderdale and The Med.

In our view, the record fully supports the trial court's finding that the defendant treated the victim with exceptional cruelty during the commission of this offense. The victim's medical records, as well as the testimony of witnesses who observed his condition after the attack, support his account of having been struck repeatedly in the head by the defendant during the robbery. Moreover, in addition to the multiple blows the defendant inflicted to the victim's head, jaw, shoulder, and arm, he also tied the victim's hands behind his back so tightly that the circulation to one hand was cut off. Under these circumstances, enhancement factor (5) was more than justified. See State v. Alexander, 957 S.W.2d 1, 6 (Tenn. Crim. App. 1997) (finding enhancement factor (5) justified when evidence established that defendant, in addition to stabbing victim in the face and body with a knife, viciously beat her in the head and arms with a claw hammer).

The record also fully supports the trial court's application of enhancement factor (8), the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community, and the defendant does not challenge the application of this factor. In sum, the trial court appropriately applied three of six enhancement factors in this case. There were no relevant factors in mitigation. In our view, the presence of these three applicable enhancement factors, combined with the absence of any mitigating factors, fully supports the maximum sixty-year sentence imposed by the trial court.

## CONCLUSION

After reviewing the record, we conclude that the evidence was more than sufficient to support the defendant's conviction for especially aggravated robbery. We further conclude that the trial court did not err in classifying the defendant as a Range III, persistent offender, or in sentencing him to the maximum sentence in his range. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-15-