# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs at Nashville April 9, 2013

## STATE OF TENNESSEE v. BRICE COOK

**Appeal from the Criminal Court for Shelby County**
**No. 08-07496     Lee V. Coffee, Judge**

---

**No. W2012-00406-CCA-R3-CD  - Filed September 4, 2013**

---

A jury convicted the defendant, Brice Cook, of premeditated first degree murder after the defendant shot the victim, Shantell Lane.  The defendant was sentenced to life imprisonment.  The defendant appeals, asserting that the trial court erred in: (1) allowing a witness to offer lay opinion testimony; (2) denying the defendant's request for a copy of a witness's prior statement to police; (3) allowing certain hearsay testimony; (4) refusing to grant a mistrial when a witness referred twice to the defendant's previous trial; (5) giving limiting instructions to the jury over the defendant's objection; (6) allowing prosecutorial misconduct during closing argument; and (7) refusing to excuse for cause potential jurors who exhibited a bias against a defendant's exercise of his or her right to remain silent.  After a thorough review of the record, we conclude that there is no reversible error.  Accordingly, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and JEFFREY S. BIVINS, J.J., joined.

William D. Massey and Lorna McClusky, Memphis, Tennessee, for the appellant, Brice Cook.

Robert E. Cooper, Jr., Attorney General & Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and David Zak and Nicole Germain, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# FACTUAL AND PROCEDURAL HISTORY

Following the shooting of the victim, the defendant was indicted for first degree premeditated murder, and his brother, Terrance Washington, was indicted for facilitation of first degree murder. At the first trial, the State introduced evidence that the defendant's ex-girlfriend, Jasmin Harris, had left him to pursue a relationship with the victim, and that, after exchanging a series of text messages with the victim and Ms. Harris, the defendant came to the victim's home and shot her in Ms. Harris's car. The defendant and co-defendant were tried together by a jury in December 2009 and were both convicted as charged. The defendant moved for a new trial based in part on certain surprise testimony from a police officer involving a statement made by the co-defendant.[1] Although the defendant testified at the December 2009 trial, the co-defendant did not, and the defendant had no opportunity to cross-examine him regarding the statement. On August 30, 2010, the trial court granted the defendant's motion for a new trial, finding a violation of the defendant's right to confront witnesses against him under *Bruton v.United States*, 391 U.S. 123, 137 (1968).

At the new trial, the defendant was tried separately from his brother and, on November 4, 2011, was again convicted of first degree murder.

During voir dire, defense counsel questioned prospective jurors regarding the defendant's exercise of his right to remain silent. Counsel had the following exchange with Prospective Juror Jones:

> Ms. McClusky: Would you hold that against him if he didn't testify?
>
> Prospective juror: yes.
>
> Ms. McClusky: You would hold it against him?
>
> Prospective juror: Yes.
>
> Ms. McClusky: You think he should?

---

[1] The defendant's original trial counsel filed a motion for a new trial, after which the defendant hired new counsel to represent him. New counsel amended the motion for a new trial to include an allegation of error in the admission of testimony regarding the co-defendant's statement.

Prospective juror: Yes, ma'am.

Ms. McClusky: Even though the judge has said, "You know the law is, they don't have to testify." Do you think – (indiscernible) – because you want people – I guess – (indiscernible) because you think people ought to explain themselves?

Prospective juror: Yes.

Counsel then asked other jurors if they agreed with Prospective Juror Jones. Prospective Juror Blaylock responded, "I don't know if I'd hold it against him, but I would question myself and wonder why he didn't testify or tell his side of the story of whatever happened. But like I say, I wouldn't hold it against him, but I would want to hear what actually happened just to hear their side of the story compared to what was said against him." Prospective Jurors Renner and Brown both adopted Prospective Juror Blaylock's reservations. Prospective Juror Renner then stated she would not hold it against the defendant if he chose not to testify.[2] Prospective Juror Blaylock subsequently elaborated that he could not, without knowing the facts of the case, say that he would not hold it against the defendant if he chose not to testify. Defense counsel challenged all four jurors for cause. The trial court questioned all four challenged jurors and elicited from Prospective Jurors Blaylock, Brown and Jones that they would not hold it against the defendant if he chose not to testify. Prospective Juror Renner had earlier stated to defense counsel that she would not hold it against the defendant if he chose not to testify, but her response to the trial court's questioning was not audible to the court reporter. Although the peremptory challenges are not a part of the record on appeal, these four prospective jurors were excused, and the defendant states that he used four of his peremptory challenges to remove these jurors. The defendant used all of his peremptory challenges.

The testimony at trial from the State's four eyewitnesses – Henrietta Niter, a neighbor who saw the shooting from her bedroom window, and the victim's roommates, Ms. Harris, Mark Brown, and Anterio Bibbs – established that the defendant shot the victim. Ms. Harris and Mr. Bibbs testified that the victim had gone to pick up Mr. Bibbs and was returning with him to the townhouse they shared with Mr. Brown and Ms. Harris. Mr. Brown testified that he was in the townhouse when he heard loud talk and went outside to speak to the defendant about a conflict between the defendant and the victim. Ms. Harris and Mr. Brown testified

---

[2] It appears from the record that Prospective Juror Brown also stated that she would not hold it against the defendant if he did not testify, but the record does not identify which prospective juror was answering.

that when the victim arrived, the defendant's brother held Ms. Harris back. Ms. Harris, Mr. Brown, and Mr. Bibbs testified that Mr. Bibbs and the victim got out of the car. All four witnesses heard one or two initial shots,[3] and Mr. Brown saw the shot, which he described as the defendant firing "down the sidewalk." Mr. Bibbs testified he began to run away when he heard gunfire but returned when he realized the victim was not with him. Mr. Bibbs returned to the car and pled with the defendant not to shoot the victim. All four witnesses testified that as the victim got back in the car[4] and attempted to escape in the vehicle, the defendant went up to the driver's side window and shot her twice. Ms. Harris testified that there may have been a third shot at that point. Mr. Brown heard the defendant say, prior to shooting the victim, "Didn't I tell you I was gonna kill you?" and he also testified the defendant's brother said, "You killed the B," and the defendant said he did not care. Mr. Bibbs testified the defendant said, "Yeah, now what?" before he shot the victim. Mr. Brown then saw the defendant hand his brother the gun, and Mr. Brown and Mr. Bibbs saw the defendant and his brother leave in separate cars, one of which Mr. Brown testified was driven by a woman. One gunshot entered the victim's left abdomen, and the other entered her left lower back.

The State introduced a series of text messages that were exchanged on Ms. Harris's phone among the defendant, the victim, and Ms. Harris. Ms. Harris testified that the victim was using Ms. Harris's phone to text with the defendant, that the victim showed her the series of texts, and that she then exchanged texts with the defendant on the same phone.

Ms. Harris's telephone stored the text messages she sent and received, and assigned each message a number sequentially. Outgoing text messages were numbered separately from incoming text messages. Ms. Harris's phone displayed the time that incoming messages were received, but did not include a time stamp on outgoing messages.

The defendant did not object to the admission of photographs of Ms. Harris's phone displaying the messages but objected when the State asked Ms. Harris to interpret them. The trial court allowed Ms. Harris to give a lay opinion regarding the meanings of the texts, which were written in non-standard English using non-standard spelling. A summary of the texts and Ms. Harris's commentary follows:

*Exhibit 6* (incoming message 36, 10:34 p.m.): "Hoe please thats

---

[3]Mr. Bibbs's testimony referenced in the parties' briefs that he did not see the shots refers to the initial shot or shots.

[4]Ms. Niter testified she ran around the back of the car, while Mr. Brown testified she ran around the front.

my girl"

Ms. Harris testified that the defendant wrote this, referring to her as his girl and to the victim as a whore.

*Exhibit 7* (outgoing message 34): "Nawl bruh who u think she been wit and who u callin a hoe bruh dis aint dat"

Ms. Harris testified that the victim sent this message to the defendant. She read the message as, "Now, girl, who you think she been with? – and who you calling a 'ho[], but ... this ain't that." She testified, that "[b]asically [the victim] was saying to him who he think that I been with and who he was calling a 'ho[] – and this isn't this."

*Exhibit 8* (incoming message 38, 10:38 p.m.): "Gettin up then name place and time how bout now"

Ms. Harris testified that the defendant sent this message, which she read, "Get 'em up, then – name a place and time – how about now?" She testified this meant, "Let's fight – name a place and time – how about now?"

*Exhibit 9* (outgoing message 35): "Yea u just like a weak n***a tryna fight a female but we can getem up u no whur i be"

Ms. Harris testified the victim showed her this message after it was sent. She read it as "Yeah, you just like a weak n****r trying to fight a female, but we can get 'em up. You know where I be." She testified that the victim was "saying that he weak for trying to fight a girl but that she will fight him, and he know where she is."

*Exhibit 10* (incoming message 40, 10:41 p.m.): "On da way"

Ms. Harris testified that the defendant sent this and read and interpreted it as, "On the way."

*Exhibit 11* (outgoing message 36): "Why u textn my phne wit dat sh*t? Aw dis aint calld 4. Why u tryna fite ha? Dats a gal

fu."[5]

Ms. Harris testified she sent this text and read it, "Why you texting my phone with that sh*t? All this ain't called for. Why you trying to fight her? That's a girl, Fu?" She explained the text as communicating "[w]hy he texting my phone, and all that ain't called for – and why he trying to fight her?"

*Exhibit 12* (outgoing message 37): "Dnt cum ova here wit dat sh*t and u need 2 apologize 2 ha."

Ms. Harris testified she sent this message, which she read: "Don't come over here with that sh*t, and you need to apologize to her." She testified she intended to communicate, "Don't come over our house and apologize to her for arguing."

*Exhibit 13* (incoming message 41, 10:42 p.m.): "Ok Kool keep her"

Ms. Harris read this as, "Okay. Cool. Keep her."

*Exhibit 14* (incoming message 42, 11:00 p.m.): "Be wit her cause when i see her she mines think im playin F**k her and it look like u wonna be wit her so F**k it"

Ms. Harris read the text: "Be with her, because when I see her, she's mine. Think I'm playing – f**k her – it look like you want to be with her, so f**k you." She testified the defendant was "[t]elling me to be with her," and that "when he see her, he was gonna fight her."

*Exhibit 15* (outgoing message 38): "Jus dnt text or call me nomo. Cuz dat was disrespectful and f**kd up and U aint gne do nun 2 ha. And dis lil jasmin"

Ms. Harris testified she sent this text, which she read as, "Just don't text or call me no more because that was disrespectful and f**ked up, and you ain't gonna do nothing to her. And this is

---

[5]Ms. Harris testified that the defendant's nickname was Fufu.

little Jasmin." She explained that she was trying to say, "Don't text or call my phone anymore because it was disrespectful and messed up, and he ain't gonna do nothing to her, and that's my name." She elaborated that she wanted to make sure the defendant knew she was the one texting him.

*Exhibit 16* (incoming message 43, 11:16 p.m.): "U will see"

Ms. Harris read this text as, "You will see."

*Exhibit 17* (outgoing message 39): "Mane d**n jus be easy um wit ha. Let tha bullsh*t go cuz it aint gne be nun."

Ms. Harris testified that she wrote, "Man, d**n, just be easy with her. Let the bullsh*t go because it ain't gonna be nothin'." She testified she intended to tell the defendant to "go on about his business" and that there would be no trouble.

*Exhibit 18* (incoming message 44, 11:18 p.m.): "Hoe what da F**k u mean I see u wit her and u wit her so u need to be askin what da F**k she said"

Ms. Harris testified that the defendant replied, "Ho[], what the f**k you mean? – I see you with her, and you with her, but you need to be asking what the f**k she said." She explained, "He's calling me a 'ho[], and he's saying what I mean that I with her; and I'm not asking what she said to him."

*Exhibit 19* (outgoing message 40): "B***h dnt call me out my name. I aint disrespectd u trick. U a lil a** boy. Loose my numba!"

Ms. Harris testified that she then wrote, "B***h, don't call me out of my name. I ain't disrespected you, trick. You a little a**boy. Lose my number?" She elaborated, "I called him by his name –asked him why he called me out my name. I said I ain't disrespect him not one time. He a little boy and lose my number."

*Exhibit 20* (incoming message 45, 11:26 p.m.): "So F**k me

-7-

right"

Ms. Harris read this text and stated it was self-explanatory.

*Exhibit 21* (incoming message 46, 11:27 p.m.): "Lose"

Ms. Harris read this text as, "Lost," and testified it was a response to her asking the defendant to lose her number.

*Exhibit 22* (incoming message 48, 12:07 a.m. 7/28/08): "So wit her right"

Ms. Harris testified that the defendant was saying, "So, you're with her, right?"[6]  The prosecution then asked if she was physically next to the victim at the time, and she responded that she was.  On cross-examination, she stated that this text referred to the fact that she was in a relationship with the victim and not that they were physically together.

*Exhibit 23* (incoming message 49, 12:11 a.m.): "Sum told me not to get back wit cha but i did like a dumb azz n***a"

Ms. Harris read the text as, "Somethin' tell me not to get back with you, but I did like a dumb-a** n****r."  She interpreted the text as, "Something told him not to date me, but he did, and he feel dumb."

*Exhibit 24* (incoming message 51, 12:16 a.m.): "Nun to say right when she done dog yo azz i might pick up da phone lol"

Ms. Harris testified that she had not responded to the defendant and he texted, "Nothin' to say, right? – when she done dog you[r] a**, I might pick up the phone, laugh out loud."  She explained, "When he was texting, I didn't reply, so he said, 'Nothin to say?' And he's saying she gonna do me wrong, and I'm going to come calling him."

The defendant objected once more during Ms. Harris's testimony regarding Exhibit 14 to the

_____

[6]Ms. Harris initially read this as, "So – do with her, right? – do you with her, right?"

admissibility of her opinion regarding the meaning of the texts, but the trial court allowed the testimony as a lay opinion.

Prior to the State calling the victim's roommate, Mark Brown, the defense brought up its intent to impeach him with the acts associated with a burglary for which he was on diversion. In response to the State's questions regarding the burglary, Mr. Brown testified that he was by himself when the crime was committed. The defense noted that the affidavit of complaint indicated that Mr. Brown had previously told police that another person was present and was the one who actually entered the home, and the defense asked for Mr. Brown's prior statement in order to impeach him. The trial court did not order the State to obtain the statement. The defendant, however, did cross-examine Mr. Brown regarding the prior statement as it was summarized in the affidavit of complaint, and Mr. Brown responded that he did not remember what he told police regarding how many persons participated in the burglary.

Another witness for the State, Officer Edward Yancey, testified that when he arrived on the scene, Ms. Harris was continually screaming, "My boyfriend killed my girlfriend." She then gave him information regarding the defendant, including his mother's address, a description of his car, and the statement that his brother held her arms during the shooting. Officer Yancey then testified that a man in blue "told me basically the same thing that she did." The defendant objected, and a bench conference, much of which was apparently indiscernible to the court reporter, followed. While the court's ruling is not entirely clear, the judge ultimately stated, "So, any of those statements, at this point, unless there's a proper foundation, I will sustain the objection to hearsay; but (indiscernible)." No curative instructions regarding the testimony on the record about the statements of the man in blue were sought or given.

Defense counsel, apparently holding a transcript of the previous trial for reference, then cross-examined Officer Yancey regarding the timing of the shooting and the 911 call. In response to a question asking whether he had reviewed the case records prior to testifying, Officer Yancey responded, "I reviewed the chronological time sheets at the last trial." Although neither the defense attorney who was examining the witness nor the court heard the reference, co-counsel and the prosecutors both confirmed that Officer Yancey used the word "trial."[7] In the presence but outside the hearing of the jurors, the trial court noted that the witness should be cautioned to use the word "hearing." The witness was apparently within four feet of the judge during this conference, but the record does not show that any admonition was addressed directly to the witness.

---

[7]Co-counsel noted that "they" heard it and appeared shocked, but it is not clear whether she was referring to the jurors or the prosecutors.

Cross-examination was resumed, and the witness again referred to "the last trial." At this point, the court excused the jury, and the defense moved for a mistrial. The trial court, noting that the indictment had two names, and implying the jury could conclude the reference was to the defendant's brother's trial, concluded that a mistrial was not the only feasible alternative. The trial court offered curative instructions, which the defense declined. At this point the trial court instructed the witness to avoid using the word "trial."

The defendant's theory of the case was that he had acted in self-defense. Accordingly, the defendant introduced the testimony of three witnesses who had not testified at the first trial and who came forward in 2010, approximately two years after the shooting. Justin Bowen, Reginald Temple, and Noel Jackson testified that the gunfire they saw appeared to be coming out of the driver's side of the vehicle. They also testified that the police had told them to leave without taking statements from them on the night of the shooting and that no one had subsequently asked them about the incident until the defendant's new legal team made inquiries two years after the crime. They testified they did not have a close relationship with either the victim or the defendant at the time of the shooting.

The defendant argued that, during a delay prior to calling 911, the victim's three roommates had hidden a gun and perhaps other evidence which tended to show that the victim had fired the first shots. Mr. Brown and Mr. Bibbs testified that the victim was unarmed. However, the defendant elicited testimony that Mr. Bibbs had recently traded the defendant a TV for a gun, which he subsequently kept in the house, that there was some delay prior to the witnesses calling 911 at 12:40 a.m., and that the victim's personal effects, including a wallet and necklace she habitually wore, were given to her mother not by the hospital but by Ms. Harris.

During closing arguments, the defense focused on its theory of self-defense. The State interrupted counsel's arguments to object that the defendant was mischaracterizing evidence, and the trial court instructed the jury that arguments of counsel should be disregarded if not supported by evidence. The State then addressed the defendant's theory of the case during rebuttal, proclaiming, "You can't shoot someone in the back and claim self-defense. Never in the history of mankind has someone been shot in the back and the shooter was defending himself." The defendant objected, but the trial court, rather than allowing counsel to elaborate on the basis for the objection, repeated the instruction that statements of counsel were not evidence to be considered by the jury and allowed the prosecution to continue with closing argument.

Because the trial court found that the text messages which the defendant had sent to the victim could be construed as threats, it instructed the jury: "If from the proof you find that the defendant has committed acts other than that for which he is on trial, you may not

-10-

consider such evidence to prove his disposition to commit such an alleged crime as that on trial." The court instructed the jury that any prior acts the defendant committed could be considered only insofar as they contributed to the complete story of the alleged crime, to show intent, and to show guilty knowledge. The instructions also allowed the jury to use such evidence to show motive, "[t]hat is, prior acts of violence or threats against the victim may be considered by you if it tends to show the defendant's and victim's relationship; the defendant's hostility toward the victim; malice, intent, motive and a settled purpose to harm the victim." The defendant objected to this instruction, arguing that the evidence did not show any prior bad acts because the text messages were non-threatening. In closing argument, the prosecution brought out the threats in the text messages, and the defense argued extensively that the text messages were not threatening.

The jury convicted the defendant of first degree murder, and he was given a life sentence. The trial court denied the defendant's motion for a new trial. It found no error in the non-production of Mr. Brown's prior statement. While Mr. Brown's prior statement to police was introduced at the hearing on the motion for a new trial as an exhibit, it is not part of the record on appeal. The trial court noted at the hearing that "Mr. Brown does, in fact, admit in his statement, now that I've reviewed it, that he and another person went to the window – broke out the window with a glass crowbar; that the person that he was with crawled in; and that they did, in fact, commit this burglary." However, the trial court found that this was a collateral issue and that impeachment was improper. At the hearing, the trial court found the references to a previous trial did not entitle the defendant to a new trial, as the State's evidence had been "overwhelming" and a mistrial was not the only feasible alternative. The trial court found it had committed no error in giving the jury instructions, and it found the prosecution's argument to be a reasonable response to defense arguments which had, in any event, no effect on the outcome of the trial. The trial court also found no error in voir dire, concluding that all of the jurors had stated unequivocally that they would not hold the defendant's decision to remain silent against him.

On appeal, the defendant asserts that the trial court should have granted a new trial based on errors in: (1) allowing Ms. Harris to testify regarding the meaning of text messages which had been sent between the victim and the defendant and which consisted of statements using non-standard English[8]; (2) denying the defendant's request for a copy of Mr. Brown's prior statement to police regarding an unrelated matter for the purposes of impeachment; (3) allowing Officer Yancey's testimony regarding the corroborating statement of the man in blue; (4) refusing to grant a mistrial when Officer Yancey referred twice to the defendant's

---

[8]While the defendant raised this issue in the motion for a new trial, the trial court, which addressed in order the other twenty-one grounds raised by the defendant, failed to make findings on this issue. The trial court denied the motion.

previous trial; (5) giving the jury instructions regarding evidence of prior bad acts; (6) allowing prosecutorial misconduct during closing argument; and (7) refusing to excuse for cause potential jurors based on a bias against a defendant's exercise of the right to remain silent.

## ANALYSIS

### I. Evidence Regarding the Text Messages

At trial, the State introduced a series of text messages that the victim, Ms. Harris, and the defendant exchanged prior to the shooting. The text messages are not in standard English, and the State, over the defendant's objection, asked Ms. Harris to interpret each text. The defendant alleges that Ms. Harris's opinion testimony was improperly admitted and that the texts should not have been admitted based on relevance.

### A. Lay Opinion Testimony

A trial court's decisions regarding the admissibility of opinion evidence are reviewed for abuse of discretion. *State v. Schiefelbein*, 230 S.W.3d 88, 130 (Tenn. Crim. App. 2007). A non-expert witness may give testimony in the form of opinion or inference if it is:

> (1) rationally based on the perception of the witness and
>
> (2) helpful to a clear understanding of the witness's testimony
> or the determination of a fact in issue.

Tenn. R. Evid. 701(a). The lay opinion testimony should be based on admissible facts which are in evidence. *State v. Boggs*, 932 S.W.2d 467, 474 (Tenn. Crim. App. 1996). While expert opinion is based on a process of reasoning which can be mastered only by specialists in the field, lay opinion should be based on a process of reasoning drawn from everyday life. *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992). A lay opinion should be within the range of knowledge or understanding of ordinary laymen. *Boggs*, 932 S.W.2d at 474. A witness's lay opinion testimony is admissible when the jury could not readily draw its own conclusions on the issue without the witness's lay opinion or where the witness cannot effectively testify without stating the inference or opinion. *Schiefelbein*, 230 S.W.3d at 130. Lay opinions must be based on the witness's own observations, should require no expertise, and ought to be within the range of common experience. *State v. Samuel*, 243 S.W.3d 592, 603 (Tenn. Crim. App. 2007).

Lay witnesses have been permitted, for example, to give testimony regarding the speed at which a car is traveling, *Kim v. Boucher*, 55 S.W.3d 551, 555-56 (Tenn. Ct. App. 2001); whether a child was afraid, *Schiefelbein*, 230 S.W.3d at 130; whether a person was physically impaired, *Boggs*, 932 S.W.2d at 474; whether a person was intoxicated, *see Kirksey v. Overton Pub, Inc.*, 804 S.W.2d 68, 75 (Tenn. Ct. App. 1990); that an injury looked like a cigarette burn, *Brown*, 836 S.W.2d at 550; that an injury caused by digging a fingernail into the victim's skin was recent, *Samuel*, 243 S.W.3d at 603; and that a door looked like it had been pried open and a footprint was similar to the defendant's, *State v. Hines*, No. M2007-00493-CCA-R3-CD, 2008 WL 2026113, at \*1-2 (Tenn. Crim. App. May 12, 2008).

However, the cause of bruising around a child's eyes was outside the permissible scope of lay testimony because it required specialized skill, *Brown*, 836 S.W.2d at 550, as was the manner in which worn tires may have contributed to an accident, *Green v. Smith*, No. M2006-01729-COA-R3-CV, 2008 WL 1901201, at \*4 (Tenn. Ct. App. Apr. 30, 2008). Lay testimony may also be improper where the witness usurps the function of the jury. *United States v. Grinage*, 390 F.3d 746, 750-51 (2d Cir. 2004) (holding that testimony interpreting both calls that the jury heard and calls the jury did not hear and making inferences highlighting similarities between the defendant's calls and others made in furtherance of a conspiracy was not permissible lay testimony under Federal Rule of Evidence 701).

While testimony interpreting telephone calls or text messages may not be permissible as lay testimony if the interpretation is based on expertise acquired through extensive police training and experience, *Grinage*, 390 F.3d at 750-51, such testimony may be permissible if it is not based on expertise but is based on personal observation and is particular to the case at hand. In *United States v. Rollins*, the court found such testimony admissible because the conspirators did not use predetermined coded references but improvised code words extemporaneously, and the agent's testimony was therefore "based on his own personal observations and perceptions derived from this particular case." *Rollins*, 544 F.3d 820, 833 (7th Cir. 2008); *see also United States v. Albertelli*, 687 F.3d 439, 447 (1st Cir. 2012) (concluding that agent's testimony was properly admitted as lay opinion because agent's knowledge of the defendants' deliberately obfuscated statements came from immersion in the case and "some of the defendants' wiretapped statements could be entirely unintelligible to the jury absent some context-based interpretation"); *United States v. Jayyousi*, 657 F.3d 1085, 1104 (11th Cir. 2011) (allowing lay testimony of agent regarding coded language when testimony was limited to what he had learned during that particular investigation and the agent interpreted code words based on their context); *United States v. Viramontes*, 419 Fed. App'x 938, 942 (11th Cir. 2011) (holding that trial court did not abuse its discretion in allowing co-conspirator who was not a party to conversations to testify regarding code words used).

-13-

The defendant asserts that some of the texts, particularly Exhibit 7, could not be understood without "specialized knowledge" and were thus inappropriately the subject of lay testimony. We conclude that Ms. Harris's testimony satisfies the statutory requirements of Tennessee Rule of Evidence 701(a) in that it was rationally based on her perception and helpful to the determination of a fact in issue. Ms. Harris's interpretation of the nonstandard spelling and usage employed in the text messages was based on a process of reasoning drawn from everyday life, was within the range of knowledge or understanding of ordinary laymen, and was within the range of common experience. *See Brown*, 836 S.W.2d at 549; *Boggs*, 932 S.W.2d at 474; *Samuel*, 243 S.W.3d at 603. Although the defendant asserts that interpreting the texts required expertise, we perceive no special requisite to deciphering the shorthand. The testimony was helpful in giving an oral rendition of the non-standard spellings. Moreover, Ms. Harris was a participant in many of the texts. Her participation in the ongoing text conversations is indicative of an understanding of the language used in the texts.

On the other hand, the defendant also cites *State v. Powers*, 101 S.W.3d 383, 413-14 (Tenn. 2003) (appendix) for the proposition that Ms. Harris's testimony should have been excluded because she was in no better position to decipher the texts than the jurors. He points to Exhibits 6, 9, and 13 as texts which are comprehensible and should not have been subject to lay opinion testimony. While opinion testimony interpreting a text which is readily understood may not be "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue" under Tennessee Rule of Evidence 701(a)(2), any error in this regard is harmless. In *Powers,* the testimony of a witness unfamiliar with the defendant identifying the defendant from a security video was admitted in error. *Powers*, 101 S.W.3d at 413-14 (appendix). We find persuasive the *Powers* court's reasoning, however, that "each juror … had the opportunity to determine for her or himself" the disputed fact. *Id.* at 414. The text messages were entered into evidence, and the jurors were able draw their own inferences regarding the meanings of the texts. Therefore, any error was harmless. We also note that our conclusion that any error was harmless is bolstered by the fact that the vast majority of Ms. Harris's "interpretations" were merely a restatement of the text with insignificant changes to wording.

The defendant also quarrels with the interpretation Ms. Harris gave to the text messages which referred to a potential fight between the victim and defendant. The defendant additionally relies heavily on Ms. Harris's misreading of the word "bruh" in Exhibit 7 as "girl," and her misreading of the word "so" in Exhibit 18 as "but." However, "[t]he precise meaning of th[e] text was a determination for the jury," which was "free to disregard" testimony, including Ms. Harris's testimony, interpreting it. *State v. Fusco*, No. M2010-01724-CCA-R3-CD, 2012 WL 6062856, at *15 n.7 (Tenn. Crim. App. Dec. 6, 2012). The jury had copies of the text messages and did not have to accept either Ms. Harris's misreading of isolated words or her interpretation regarding a potential confrontation

-14-

between the defendant and the victim. Such inferences are the province of the jury and the ambiguity does not affect the texts' admissibility. *See Kim*, 55 S.W.3d at 556. Ms. Harris's testimony was properly admitted as lay opinion testimony, and we conclude that any error in admitting any part of her testimony which did not contribute to a clear understanding of a fact in issue was harmless.

## B. Relevance

The defendant also argues on appeal that Exhibits 6, 8 through 21, and 23 should have been excluded because the messages are not relevant and thus, not admissible and because testimony did not establish exactly when many of these texts[9] were sent in the conversation between the victim, Ms. Harris, and the defendant. As the State correctly points out, the defendant did not raise the relevance issue or object to the admission of the texts themselves either at trial or in the motion for a new trial. This argument is therefore waived. Tenn. R. App. P. 36(a); Tenn. R. App. P. 3(e). However, we conclude the messages were relevant.

Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The defendant does not argue that the evidence, while relevant, should have been excluded because its probative value was outweighed by unfair prejudice, confusion, or waste of time under Tennessee Rule of Evidence 403.

While taking the messages out of order, as the prosecution did at trial and as the defendant's brief does, certainly contributes to an impression of confusion, the transcript of the trial shows that Ms. Harris properly testified regarding the order that the messages between her and the defendant were sent and received, and apparently sorted all the messages into chronological order during cross-examination.[10] Ms. Harris testified she could not be certain which of the messages between the victim and the defendant came first because there was no time-stamp on her outgoing messages; however, whether the references to a confrontation were initiated by the victim or the defendant goes to the weight given to and inferences to be drawn from the evidence, not its admissibility. Ms. Harris properly testified

---

[9]The defendant acknowledges that Exhibits 17 to 19 appear to be a sequential conversation.

[10]Insofar as the defendant's challenge is based on the fact that there appear to be gaps in the texts introduced at trial (e.g., incoming messages 36 and 38 were introduced, but incoming message 37 was not), this argument is waived because the defendant did not object at trial and has not adequately briefed the issue. We note that Lieutenant Donald Crowe testified at trial that Ms. Harris showed him, and he subsequently photographed, "text messages that were relevant to the case."

that the messages were sent as part of a confrontation between the victim and defendant immediately prior to the shooting.

The series of texts between the defendant, the victim, and Ms. Harris tended to show that the victim and the defendant had hostile feelings towards each other because of their relationships with Ms. Harris. The texts also demonstrate that Ms. Harris ultimately rejected the defendant and instructed him to lose her number. The texts show the victim's and Ms. Harris's understanding that the defendant intended to fight the victim. The defendant's statements "Gettin up,"[11] "name place and time," and "she mines" could reasonably be understood as threats. Accordingly, the texts are relevant to the issues of motive, premeditation, and intent. Because the defendant has waived any objections to the relevance or admissibility of the texts and the texts are in any event relevant, this issue is without merit.

## II. Jencks Violation

The defendant next objects to the trial court's refusal to order the prosecution to provide him with the statement Mr. Brown had made to police regarding an unrelated burglary. The affidavit of complaint indicates that Mr. Brown had previously told police he was not alone when he participated in the burglary, although he testified at trial that he was alone. The defendant sought and was denied the actual statement which Mr. Brown had made to police. While both the State and the trial court premise the absence of error on the fact that the issue was collateral and any effort to introduce the statement as extrinsic impeachment evidence would have failed, the defendant's assignment of error is that failure to produce the statement denied him the tools to effectively cross-examine the witness. Because the defense does not allege that it intended to introduce the statement into evidence, Tennessee Rule of Evidence 613(b) regarding extrinsic evidence of prior inconsistent statements is not implicated.

Tennessee Rule of Criminal Procedure 26.2 requires that:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in

_____

[11] According to trial testimony, this was a misspelling of "get 'em up," which we note is a colloquial reference to raising one's fists to fight.

-16-

their possession[12] and that relates to the subject matter of the witness's testimony.

Tenn. R. Crim. P. 26.2(a). A statement is defined as:

> (1) A written statement that the witness makes and signs, or otherwise adopts or approves; or
>
> (2) A substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement.

Tenn. R. Crim. P. 26.2(f). Sanctions for failure to produce the statement may include striking testimony or declaring a mistrial. Tenn. R. Crim. P. 26.2(d). Tennessee Rule of Criminal Procedure 26.2, commonly known as the codification of the Jencks Act, emanates from the United States Supreme Court's decision in *Jencks v. United States*, 353 U.S. 657, 668 (1957), which gave the defendant a right to inspect prior statements of government witnesses which were related to the witnesses's testimony on direct examination. *State v. Caughron*, 855 S.W.2d 526, 534-35 (Tenn. 1993). "The purpose of Rule 26.2 is to enable counsel to examine a witness's statements in order to test the credibility of that witness at trial." *Caughron*, 855 S.W.2d at 535.

We note that the State's duty to provide the statement is wholly independent of the question of whether or not it is admissible as extrinsic evidence, as "[t]he provisions of Rule 26.2 deal with production of statements and not with their eventual use." David Louis Raybin, 10 *Tenn. Prac. Crim. Prac. & Procedure* § 27:111 (2012-2013 ed.). The defendant moved for the production of the statement regarding the burglary, and the statement was related to the subject matter of Mr. Brown's testimony on direct examination regarding the involvement of an accomplice in the burglary. At the hearing on the motion for a new trial, the trial court noted that the statement was signed by Mr. Brown on January 12, 2007; it was therefore a "statement" within the definition of Tennessee Rule of Criminal Procedure 26.2(f) and should have been produced.

"[O]nce a Jencks statement is deemed producible, 'the defendant's right to the

---

[12]While it appears from the record that the State did not have the requested statement in its immediate possession, we have previously concluded that "it was the duty of the State to exercise due diligence in obtaining [the statement]." *State v. Cannon*, 661 S.W.2d 893, 899 (Tenn. Crim. App. 1983). Given the ultimate disposition of this issue, we do not decide the State's obligation in this respect.

statement is virtually absolute.'" *Caughron*, 855 S.W.2d at 554 (Daughtrey, J., dissenting) (quoting *Wharton on Criminal Procedure* § 378 (13th ed.)). However, the improper denial of Jencks material is not, *per se*, constitutional error, although it might, in certain circumstances, implicate the defendant's right to confrontation. *Caughron*, 855 S.W.2d at 554 (Daughtrey, J., dissenting). While federal courts have hence applied a more intense scrutiny in determining whether a Jencks violation was harmless, *id.* at 555, a violation which withstands such scrutiny does not require reversal. *Id.* at 556 n.7 (Daughtrey, J., dissenting). Thus, error has been held harmless in federal court where the withheld statement was consistent with direct testimony, would have supported the prosecution's case, was not integral to the case, or was cumulative of other material. *Id.* (citing cases).

In *United States v. Anthony*, 565 F.2d 533, 537 (8th Cir. 1977), the court concluded that any Jencks violation was harmless, as "substantially the same evidence was included in the grand jury transcript" with which the defendant was provided. Similarly, in *United States v. McKenzie*, 768 F.2d 602, 610 (5th Cir. 1985), the defendant cross-examined the witness using grand jury testimony and other statements. Because the withheld material "did not contain any additional information that would have aided their cross-examination" and provided "only minor cumulative impeachment material," the error was harmless. *Id.*; *see also United States v. Ferber*, Crim. No. 89-00448-01, 1991 WL 16751, at *7 (E.D. Pa. Feb. 8, 1991) (citing cases where withholding cumulative material was held to be harmless error).

Likewise, in *State v. Becton*, a police officer created an offense report and transmitted the report on a telephone call which was recorded. *State v. Becton*, No. 02C01-9109-CR-00192, 1993 WL 1862, at *1 (Tenn. Crim. App. Jan. 6, 1993). A printout of substantially the same information was also created. *Id.* The defendant was ultimately able to cross-examine the witness using the printout, but the offense report and recording had been destroyed. *Id.* at *2-3. Although there was "some contradiction" between the computer printout and the witness's testimony, the court concluded the defense had conducted a "full and complete cross-examination" with the printout and that any error in the State's failure to produce the original report or recording was harmless. *Id.* at *5; *see also Cannon*, 661 S.W.2d at 899 (concluding that failure to provide recorded police report was harmless error where the officer's testimony was cumulative of other witness testimony); David Louis Raybin, 10 *Tenn. Prac. Crim. Prac. & Procedure* § 27:113 ("Tennessee courts look to prejudice as well.").

Although the trial court noted on the record that, contrary to his trial testimony, Mr. Brown did acknowledge in the statement that he was not alone when he committed the burglary, the appellate record does not include Mr. Brown's statement. Accordingly, we have before us only the factual finding that the statement did contradict the witness's trial testimony. The defendant has a duty to prepare a record that conveys "a fair, accurate and

-18-

complete" record which will enable the appellate court to decide the issues. Tenn. R.App. 24(b); *see State v. Taylor*, 992 S .W.2d 941, 944 (Tenn. 1999). The defendant alleges only that he could have used the statement to cross-examine the witness regarding whether or not an accomplice was present when he committed the crime. However, the information that the defendant previously told police he was not alone was also contained in the affidavit of complaint which the defendant in fact did use to cross-examine the witness and impeach his testimony. The information in the statement was, according to the limited record before us, cumulative to that available to defense counsel. Furthermore, the subject matter of the withheld statement was "not an integral part of the government's case." *Caughron*, 855 S.W.2d at 556 n.7 (Daughtrey, J., dissenting). As the trial court noted, this issue was completely collateral to any facts contested at trial. Defense counsel had the substance of Mr. Brown's statement and was able to adequately explore the inconsistency in Mr. Brown's testimony on cross-examination. We conclude the trial court erred by not providing the *Jenks* material. However, the error was harmless for the reasons stated above.

### III. Hearsay Testimony

On appeal, the defendant argues that the testimony Officer Yancey regarding the statement of the unidentified man in blue corroborating the excited utterance of Ms. Harris was inadmissible hearsay which violates his right to confrontation. However, the defendant's motion for a new trial does not raise this issue.[13] This argument is therefore waived.[14] Tenn. R. App. P. 3(e). Therefore, the defendant is not entitled to relief on this issue.

### IV. References to Previous Trial

The defendant next objects to Officer Yancey twice during his testimony referring to the previous trial. Although the trial court and one of the defendant's attorneys did not hear the initial reference, the judge stated during a bench conference that the word "hearing" rather than "trial" should be used. Nevertheless, the witness, who was not directly admonished, again referred to the previous trial. The defendant moved for a mistrial, and the trial court denied the motion but offered curative instructions, which the defendant refused.

---

[13]The motion for a new trial does object on a hearsay basis to testimony from Officer Christopher Parker regarding hearsay statements by Ms. Harris detailing the relationship between Ms. Harris and the defendant.

[14]We note additionally, that based on the record, it appears that the trial court sustained the defendant's objection to the hearsay testimony. The defendant sought no curative instructions. "[A] party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error" is not entitled to relief. Tenn. R. App. P. 36(a).

The trial court declined to grant a new trial based on the error, noting that the evidence of the defendant's guilt was overwhelming.

A motion for a mistrial is a procedural device requesting the trial court to stop the trial, discharge the jury, and impanel another jury to determine the verdict. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). A mistrial should be declared only upon a showing of manifest necessity or when continuation of the trial would result in a miscarriage of justice. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). A manifest necessity exists when there is no feasible alternative to halting the proceedings. *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993); *State v. Smith*, 810 S.W.2d 155, 158 (Tenn. Crim. App. 1991). The granting or denial of a request for a mistrial rests within the trial court's discretion, and an appellate court will not reverse the decision absent a clear showing that the trial court abused its discretion. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). The burden of establishing the necessity of a mistrial lies with the party seeking it. *State v. Reid*, 164 S.W.3d 286, 342 (Tenn. 2005) (appendix). "The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). In determining whether the trial court has abused its discretion, the appellate court should consider (1) whether the State elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the strength or weakness of the State's case. *Id.*

A reference to a previous trial does not necessarily constitute "manifest necessity" for the purposes of a mistrial. In *State v. Sanders*, a witness was asked if a video of an accident accurately reflected the events and stated that if it was the video from the first trial, it did. *State v. Sanders*, No. W2006-00760-CCA-R3-CD, 2009 WL 1424188, at *11 (Tenn. Crim. App. May 20, 2009) On appeal, this Court concluded that the trial court did not abuse its discretion in denying a mistrial, as the statement had not been elicited by the prosecution, and curative instructions were not requested to avoid calling attention to the incident. *Id.* at *12. Likewise, in *State v. Claybrook*, the prosecutor inadvertently referred to the prior "trial" rather than "hearing," and the defense rejected a curative instruction as more likely to emphasize the mistake. *State v. Claybrook*, No. 3, 1992 WL 17546, at *13 (Tenn. Crim. App. Feb. 5, 1992). The Court found it was not error to refuse a mistrial, as the reference did not, under the circumstances, affect the verdict. *Id.*; *see also Garrett v. State*, No. M2011-00333-CCA-R3-PC, 2012 WL 3834898, at *25 (Tenn. Crim. App. Sept. 5, 2012) (concluding, in a post-conviction petition, that it was "highly unlikely that a mistrial would have been granted" for a passing reference to a prior trial); *see also State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994) (concluding that an unresponsive and unsolicited reference to the defendant's incarceration could not have prejudicially affected the verdict or sentence in light of the overwhelming proof of the defendant's guilt); *Welcome*, 280 S.W.3d at 222 (holding that reference to defendant's prior incarceration did not require a mistrial because

it had been unsolicited, because curative instructions had been given, and because State's case was strong).

In the case at bar, the State did nothing to elicit the testimony. The reference to the trial was made during the defense's cross-examination of the witness, but the trial court found that the testimony had also not been responsive to the defendant's questions. The witness asserted that he had made the references to the trial because defense counsel was holding the transcript of the prior trial during the cross-examination, although defense counsel did not reference it in his questions to the witness. After the first reference, there was confusion regarding whether the word "trial" had been uttered, and the witness was not properly instructed to avoid further use of the word "trial," although the trial court had ruled that the witness should use the word "hearing." The defense continued cross-examination without objecting to the failure to instruct the witness directly. On the second reference, the trial court excused the jury and admonished the witness. The trial court then offered curative instructions. The defendant, however, declined the instructions as a strategic decision to minimize the impact of the references to the prior trial. We conclude, along with the trial court, that the evidence in this case was particularly strong. All three factors weigh in favor of the trial court's decision, and we conclude that the trial court did not abuse its discretion in refusing to grant a mistrial.

## V. Jury Charge Regarding Prior Bad Acts

The defendant next objects to the jury instructions regarding prior bad acts which the trial court gave over the defendant's objection. The trial court gave limiting instructions which admonished the jury that if they found the defendant had "committed acts other than that for which he is on trial," such evidence could not be used to show criminal propensity, but could show intent, guilty knowledge, or motive.

Under the Tennessee Rule of Evidence 404:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other

than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Evidence of other offenses "may be admissible to show (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; or (6) a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other." *State v. Osborne*, 251 S.W.3d 1, 12 (Tenn. Crim. App. 2007). When such evidence is introduced, "limiting instructions are critical in preventing the improper and prejudicial use of proof of other crimes." *State v. Howell*, 868 S.W.2d 238, 255 (Tenn. 1993).

Tennessee Rule of Evidence 105 provides:

When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly.

While the Rule addresses limiting instructions given "upon request," the trial court itself has the inherent authority to issue such limiting instructions. *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 199 (Tenn. Ct. App. 2008) (noting that a court may provide limiting instructions on its own motion); Neil P. Cohen et al., *Tennessee Law of Evidence* § 1.05[4] (6th Ed. LexisNexis Matthew Bender).

Although "[t]rial judges, ordinarily, should not override a lawyer's tactical decision on this issue," Neil P. Cohen et al., *Tennessee Law of Evidence* § 1.05[4], Tennessee cases have emphasized the trial court's obligation to consider giving limiting instructions when appropriate. The Tennessee Supreme Court has stated that "it is the duty of trial courts to give limiting jury instructions when evidence is being admitted for only a limited purpose." *State v. Dutton*, 896 S.W.2d 114, 116 (Tenn. 1995); *see also State v. Dishman*, 915 S.W.2d 458, 462 (Tenn. Crim. App. 1995); *State v. Killebrew*, 760 S.W.2d 228, 231 n.8 (Tenn. Crim. App. 1988) ("When evidence is introduced for a limited purpose, the trial court should give a limiting instruction to the jury which explains the limited use or purpose of the evidence.");

*Jenkins v. State*, 509 S.W.2d 240, 246 (Tenn. Crim. App. 1974) ("But the jury should be instructed to consider impeaching testimony as affecting only his credibility as a witness, and not as impairing the presumption of innocence."). Even when a defendant does not request a limiting instruction, "trial court should consider whether a sua sponte instruction is warranted to foreclose a reversal on appeal for plain error." *State v. Carruthers*, 35 S.W.3d 516, 554 n.40 (Tenn. 2000).

In *State v. Brown*, 836 S.W.2d 530, 553 (Tenn. 1992) the defendant alleged that the trial court had erred in giving an instruction that amnesia was not a defense to the crime. The defense raised a claim of insanity, and the defendant asserted that "an instruction relating to amnesia was irrelevant to the issues at trial." *Id.* "[A] trial court's jury charge 'should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury.'" *State v. Hatcher*, 310 S.W.3d 788, 812 (Tenn. 2010) (quoting *Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007)). However, the trial judge has the duty to give a complete charge. *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986). In *Brown*, the appellate court found no error in giving the instructions regarding amnesia because it concluded that the issue of amnesia had been raised by the proof at trial and that the jury instructions were therefore proper. *Brown*, 836 S.W.2d at 553.

"An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). Here, although the defendant maintained that the text messages were not threatening, the question of whether or not the messages constituted threats was fairly raised by the evidence and pursued aggressively by the State during closing argument as proof of premeditation. Accordingly, the limiting instructions regarding any bad acts committed by the defendant did not constitute error.

## VI. Prosecutorial Misconduct

The defendant also objects to the prosecution's statement, during closing arguments, that "[y]ou can't shoot someone in the back and claim self-defense. Never in the history of mankind has someone been shot in the back and the shooter was defending himself." The trial court refused to hold a bench conference when the defendant objected to this statement, but repeated an instruction that counsel's arguments should be disregarded if not supported by evidence, an instruction which it had previously offered after the prosecution objected that defense counsel was mischaracterizing evidence. At the motion for a new trial, the trial court found that this statement was a reasonable response to the self-defense theory put forth by

the defendant and that it did not, in any case, affect the outcome of the trial.

Closing arguments, which have "special importance in the adversarial process," are intended to sharpen and clarify issues by allowing the attorneys to present their theory of the case and highlight strengths and weaknesses in the evidence. *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). The trial court is entrusted with wide discretion in controlling the course of closing arguments and its decision will only be reversed upon an abuse of discretion. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). Closing argument is a valuable privilege which should not be unduly restricted. *Id.*; *Russell v. State*, 532 S.W.2d 268, 271 (Tenn. 1976). "Our courts seek to give great latitude to counsel in expressing their views of the case to the jury," both in style and substance. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975); *see also Banks*, 271 S.W.3d at 131.

Prosecutors must pursue their cases with "thoroughness and vigor within the bounds of the law and professional conduct," and closing arguments may have a "rough and tumble quality." *Banks*, 271 S.W.3d at 131. Nevertheless, the prosecution has an obligation to pursue justice impartially and to see to it that the defendant receives a fair trial. *Id.* While colorful and forceful language is permissible, the prosecution may not stray from the evidence or from reasonable inferences to be drawn from the evidence. *Id.* Closing arguments must therefore be (1) temperate; (2) predicated on the evidence introduced at trial; and (3) pertinent to the issues being tried. *State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). Though the prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Id.* (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

Furthermore, "[i]t is unprofessional for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge," because reference to facts outside the record "could involve a risk of serious prejudice." *State v. Goltz*, 111 S.W.3d 1, 9 (Tenn. Crim. App. 2003) (quoting *Standards Relating To The Prosecution Function And The Defense Function* § 5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

Because the evidence at trial did not include all the events in the history of humankind, this particular phrase in the prosecution's argument was not based on evidence introduced during trial. However, the use of the phrase "never in the history of mankind," best understood as hyperbole[15] intended to emphasize how the physical evidence – the

---

[15]*See United States v. Vaccaro*, 115 F.3d 1211, 1216 (5th Cir. 1997) ("[W]e assume that a jury has the common sense to discount the hyperbole of an advocate, discounting the force of the argument."); *Mooney v. Trombley*, No. 05-CV-71329-DT, 2007 WL 2331881, at *26 (E.D. Mich. 2007) ("This use of
(continued...)

gunshot entrance wounds in the victim's side and back – may have been at odds with the defendant's theory of self-defense, while not proper, does not require reversal.

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Reversal is required when the improper conduct affected the verdict to the defendant's prejudice. *State v. Middlebrooks*, 995 S.W.2d 550, 559 (Tenn. 1999). The appellate court weighs the following factors in determining whether the verdict was affected:

> 1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case.

*State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998).

In considering the facts and circumstances surrounding the conduct and counsel's intent, the appellate court may consider whether the improper remark was "triggered" by defense counsel's closing argument. *State v. Jordan*, 325 S.W.3d 1, 65 (Tenn. 2010) ("While the prosecutor reached too far in his argument, it appears that the prosecutor was at least trying to place his argument in some overall context triggered by the argument of defense counsel."). "[T]he idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole." *State v. Thomas*, 158 S.W.3d 361, 415 (Tenn. 2005) (appendix) (quoting *Darden v. Wainwright*, 477 U.S. 168, 182 (1986)).

In the case at bar, the facts and circumstances do not support reversal. The reference was "brief and isolated," appearing only once during the course of the trial, in closing argument. *See Middlebrooks*, 995 S.W.2d at 560. The statement was hyperbole intended to illustrate a reasonable inference to be drawn from the physical evidence of the gunshot wounds and triggered by the defendant's theory. The second factor also does not support reversal. The defendant promptly objected, and the trial court, while refusing a bench conference, just as promptly instructed the jury to disregard argument not supported by evidence, an instruction the jury had already had occasion to hear. A jury is presumed to follow the trial court's instructions. *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006).

---

[15](...continued)
hyperbole to make a point which was a fair inference from the evidence did not deprive petitioner of a fair trial.").

Neither does the prosecutor's intent favor reversal, as the reference was intended to counteract defense counsel's extensive arguments that the proof supported a theory of self-defense. Finally, the last two factors also do not weigh in favor of reversal. We discern no other significant errors in the trial. As the trial court found during the hearing on the motion for a new trial, the prosecution's case was very strong. Accordingly, we conclude that the statement was not so improper that it affected the verdict to the defendant's prejudice.

## VII. Juror Disqualification

The defendant alleges that the trial court should have granted a new trial because four of the prospective jurors should have been excused for cause. At the hearing on the motion for a new trial, the trial court found that each juror had stated unequivocally that he or she would not hold the defendant's refusal to testify against him. A trial court's decisions regarding juror qualifications are reviewed for an abuse of discretion. *State v. Hugueley*, 185 S.W.3d 356, 378 (Tenn. 2006); *State v. Mickens*, 123 S.W.3d 355, 375 (Tenn. Crim. App. 2003). Absent manifest error, the court's decision will not be reversed . *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993).

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution both guarantee the accused the right to trial "by an impartial jury." The guarantee in the Tennessee Constitution has been interpreted to mean a jury free from "disqualification on account of some bias or partiality toward one side or the other of the litigation." *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003) (quoting *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993)). Bias is "a leaning of the mind; propensity or prepossession towards an object or view, not leaving the mind indifferent; a bent; for inclination." *Id.* "In particular, '[t]he right of challenge for cause was designed to exclude from the jury triers whose bias or prejudice rendered them unfit, and peremptory challenge was intended to exclude those suspected of bias or prejudice.'" *State v. Pamplin*, 138 S.W.3d 283, 285-86 (Tenn. Crim. App. 2003) (quoting *Manning v. State*, 292 S.W. 451, 455 (1927)).

Tennessee Rule of Criminal Procedure 24(c)(2)(B) provides in part that "[a] prospective juror who admits to having formed an opinion about the case is subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial." The Advisory Commission comment elaborates that:

> A prospective juror who has formed or expressed an opinion as to the merits of the case may still be qualified to serve, but only upon an unequivocal showing of impartiality. The commission disapproves of questions tending to lead the prospective juror or

suggest partiality in the first instance, and also disapproves of that procedure in "rehabilitating" the prospective juror into vocalizing impartiality. Such a prospective juror shall be held to be qualified only upon a truly unequivocal showing of impartiality.

Tenn. R. Crim. P. 24 Advisory Comm'n cmt.; *see also State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989) (disapproving of rehabilitation when "[i]t was only after lengthy questioning by the trial court and the prosecutor that this juror eventually replied unequivocally 'yes' regarding her ability to overcome any preconceptions and render a fair and impartial determination"). "The standard for whether a juror was properly excused for cause is 'whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Mickens*, 123 S.W.3d at 375 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotation omitted)). A juror who has formed an opinion on the merits of the case need not be disqualified if he or she can lay aside that opinion and render a verdict based instead on the evidence presented at trial. *Howell*, 868 S.W.2d at 249 (quoting *State v. Sammons*, 656 S.W.2d 862, 869 (Tenn. Crim. App. 1982)); *State v. Humphreys*, 70 S.W.3d 752, 766 (Tenn. Crim. App. 2001). "Thus, when a prospective juror expresses disagreement with the law, 'it should be determined that the juror cannot or will not follow the law (regardless of disagreement with it) before he or she is disqualified.'" *State v. Bean*, No. M2000-02797-CCA-R3-CD, 2001 WL 1089760, at *3 (Tenn. Crim. App. Sept. 18, 2001) (quoting *Brazelton v. State*, 550 S.W.2d 7, 10 (Tenn. Crim. App. 1974)).

Here, four potential jurors expressed some reservations about the defendant's exercise of his constitutional right to remain silent. Prospective Juror Jones stated unequivocally during initial questioning by defense counsel that he would "hold it against" the defendant if the defendant chose not to testify and that he would do so regardless of the law charged by the judge. Prospective Juror Blaylock stated that he would want to hear the defendant's version of events. He stated initially that he either did not know if he would hold the defendant's decision not to testify against the defendant or he would not do so, and then subsequently elaborated that he could not say, without knowing the facts of the situation, whether or not he would hold it against him. Prospective Jurors Renner and Brown agreed that they would want to hear the defendant's version of events, but Prospective Juror Renner stated that she would not hold his silence against him. After the defendant challenged the jurors for cause, the trial court questioned each juror and elicited from each the response that he or she would not draw any negative inferences from the defendant's decision to remain silent. All of the prospective jurors eventually answered unequivocally.

This Court has disapproved of lengthy rehabilitation in the past. *Kilburn*, 782 S.W.2d

at 203; *see also* Tenn. R. Crim. P. 24 Advisory Comm'n cmt. However, we need not decide the bounds of appropriate rehabilitation in this case because the defendant has made no allegation that the jury which ultimately heard his case was not impartial. "[T]he failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges *and* an incompetent juror is forced upon him." *Hugueley*, 185 S.W.3d at 379 (quoting *Howell*, 868 S.W.2d at 248) (concluding that defendant who exhausted all of his peremptory challenges was not entitled to relief because jurors who judged his case were not disqualified to do so). Any error in failing to excuse a juror for cause is harmless "unless the jury who heard the case was not fair and impartial." *Howell*, 868 S.W.2d at 248; *see State v. Middlebrooks*, 840 S.W.2d 317, 329 (Tenn. 1992) ("Although counsel for the defendant argues that he had to exhaust all of his peremptory challenges on jurors that should have been excluded for cause, he does not tell us how Middlebrooks was prejudiced by not being able to peremptorily challenge any of the jurors who ultimately heard the case.") *superseded by statute on other grounds as recognized by State v. Reid*, 91 S.W.3d 247, 306 n.13 (Tenn. 2002); *State v. Hampton*, No. W1999-00983-CCA-R3-CD, 2000 WL 1840071, at *8 (Tenn. Crim. App. Dec. 6, 2000) (declining to find error where "[t]he defendant [did] not allege that any other member of the jury was in any way prejudiced, biased, or otherwise incompetent to serve."). We note additionally that absent proof of the use of peremptory challenges, the defendant must "show actual prejudice or bias (propter affectum) in order to prevail on his jury complaints." *Kilburn*, 782 S.W.2d at 202

The defendant in this case alleges he used his peremptory challenges to exclude the four jurors whom the trial court did not disqualify for cause. The record shows that the defendant used all of his peremptory challenges during the course of voir dire. However, the defendant does not allege, and the record does not support, any partiality or bias on the part of the jurors who ultimately made up the jury. After the defendant excluded the jurors who had expressed reservations about the defendant's exercise of his right to remain silent, voir dire concluded uneventfully, and the defendant points to no incompetent juror who served on the trial. Because the jurors about whom the defendant complains were not ultimately forced on the defendant, any error in failing to excuse them for cause was harmless. *See State v. Mann*, 959 S.W.2d 503, 533 (Tenn. 1997).

## CONCLUSION

Because we discern no reversible error, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE